Syllabus.

## Richmond

### CITY OF RICHMOND V. CARNEAL AND OTHERS.

March 17, 1921.

Absent, Kelly, P.

1. CONSTITUTIONAL LAW—*Test of Validity—What May be Done Under Statute.*—The test of the validity of a statute is not merely what has been done under it, but what may be done under it.

2. EMINENT DOMAIN—*Streets and Highways—Public Use—Taking for Maintenance of a Street.*—While the opening of a public street is recognized as a public use, there is no law to warrant taking for the purpose of "maintenance of a public street."

3. EMINENT DOMAIN—*Expediency of Exercising Power—"Public Use"—Questions for the Legislature and Courts.*—While the question of the necessity, propriety, or expediency of resorting to the exercise of the power of eminent domain is a legislative function, in the absence of a constitutional inhibition, what constitutes a "public use" is a judicial question to be decided by the courts. The legislature is forbidden to enact "any law whereby private property shall be taken or damaged for public uses, without just compensation," which in effect carries out the fundamental law of England and America that private property cannot be taken for private use, with or without compensation, but can *only* be *taken* for a public use. This inhibition, like other constitutional provisions, it is the duty of the courts to enforce. The legislature cannot conclude the constitutionality of its own enactments.

4. EMINENT DOMAIN—*"Public Use"—"Public Benefit."*—"Public use" and "public benefit" are not synonymous terms. "Public use" means a use by the public. The legislature cannot make a private use public by calling it so, in order to justify the exercise of the power of eminent domain.

5. EMINENT DOMAIN—*"Public Use"—Incidental or Indirect Public Benefit.*—The remedy by the exercise of the power of eminent domain is a drastic one and its application is restrained by the Constitution to those cases where the taking or damaging of private property is for "public use." What is a "public use"

is not a matter of discretion with the courts, but is one of sound judgment, under all the facts and circumstances of the particular case. Different courts sometimes arrive at differ-- ent conclusions upon the same state of facts; but, whenever the remedy is applied, it should always be because there is a direct "public use" of the property taken, and not a mere incidental or indirect public benefit.

6.  EMINENT DOMAIN—*Public Use—Taking Land for Street in Excess of that Necessary—Constitutionality of Acts* 1916, *p.* 112. —So much of the act of Assembly, approved February 29, 1916, found in Acts of 1916, pp. 112, 113, as is an amendment of the act of Assembly approved March 14, 1906, found in Acts of 1906, p. 317 (constituting the second and last paragraph of section 3065 of the Code of 1919), providing that a city or town desiring to open or widen a street may acquire by condemnation all or any part of the property in a square or block and replat and dispose of the property so acquired, where the property abutting the proposed street would be injuriously affected unless the property on such block or square is replatted, is unconstitutional.

Error to a judgment of the Hustings Court of the city of Richmond on a petition to condemn land. Judgment for defendants. Petitioner assigns error.

*Affirmed.*

The opinion states the case.

*H. R. Pollard,* for the plaintiff in error.

*J. Thomas Hewin, Jas. T. Carter, J. Samuel Parrish, D. C. O'Flaherty, J. C. Robertson* and *J. R. Pollard,* for the defendants in error.

BURKS, J., delivered the opinion of the court.

The chief point involved in this case is the constitutionality of an act of Assembly approved February 29, 1916, amending a previous act, relating to the opening and widening of streets by cities and towns. Acts 1916, pp. 112, 113. So much of the act as need be quoted is as follows:

"Any city or town in this Commonwealth proposing to open or widen a street by taking any part of a block or square in such a manner that the value of the property abutting the proposed street would be injuriously affected unless the property on such block or square is replatted and the property line readjusted, then and in that event the city or town * * * may * * * acquire by * * * condemnation all or any part of the property on such squares or blocks and may subsequently replat and dispose of the property so acquired, in whole or in parts, making such limitations as to the uses thereof as it may see fit."

The city had annexed to its boundaries the town of Ginter Park, and under the decree of annexation was required to open a suitable and adequate highway from said town to the business center of the city. Pursuant to that decree, and by virtue of the authority of said act of Assembly, the city, by its constituted authorities, petitioned the Hustings Court of the city to open a boulevard eighty feet wide between two designated points in the city as enlarged, and filed with its petition a map or diagram of the proposed boulevard showing the land proposed to be taken for the location of the boulevard, and also the land on each side thereof proposed to be taken. The petition states that the land proposed to be condemned is needed for the opening and maintenance of a public street. The map or diagram filed with the petition shows that the proposed boulevard is of a uniform width of eighty feet, with a parkway in the center, and that it cuts diagonally across one or more squares or blocks of the city, so that the residue of lots therein not taken for the boulevard would touch the said boulevard obliquely and not on perpendicular lines. In some instances it would take a large portion of the lot through which it runs, in others only a small portion. It is stated in the resolution of the city council directing the

condemnation, and also in the petition, that the city council is of opinion that not to acquire all or parts of the proposed property on certain· blocks, squares or lots, through which the said proposed street will pass, would render it impracticable, without extraordinary expense, to make the proposed improvement, and it was also of opinion that certain of the properties abutting on the strips or parcels of land so to be acquired for the opening of the said street would be injuriously affected in value unless the whole or certain parts of the property in such blocks or squares are replatted and the lines readjusted to the new proposed street lines. The map or plat shows distinctly not only the lines of the street or boulevard proposed to be taken, but also the land on each side thereof proposed to be taken. Certain of the proprietors of lands proposed to be taken appeared· and moved to dismiss the city's petition on several grounds, but chiefly on the ground that the statute aforesaid and the ordinance of the city passed in pursuance thereof are unconstitutional and void in so far as they authorize the taking of the lands outside of the strip eighty feet wide which was to be used for the street, because the use to which they were to be applied was not a public use. The Hustings Court took this ·view of the case, and while it directed the establishment of the street, or boulevard, of the uniform width of eighty feet, as shown on the map or plat, it dismissed the petition as to the lands outside of said street or boulevard. To this order a writ of error was awarded by this court.

.The ordinance of the city and also the petition cite and rely upon the act of February 29, 1916, as authority for the right to condemn the lands outside of the lines of said street or boulevard. It is obvious, therefore, that the determinative question in the case is the validity of the statute aforesaid.

The only evidence offered in the cause was the map aforesaid and the resolution of the city council, which were

filed as exhibits with the petition, and which are also referred to by the commissioners who assessed the damages.

[1]    We remark *in limine,* that the test of the validity of the statute is not merely what has been done under it, but what may be done under it.    *Violett* v. *Alexandria,* 92 Va. 561, 23 S. E. 909, 31 L. R. A. 382, 53 Am. St. Rep. 825.

Under the act above quoted, if the proposed street takes only a small portion of a lot, leaving the owner's dwelling or place of business, or both, untouched, the city may, nevertheless, take the residue also, if the other conditions mentioned in the act exist, and the statement in the brief of counsel for J. D. Carneal is that just this condition exists in the instant case.    That statement is that "the street or parkway cuts off a little corner of his lot; outside of that is a house, which is a home and a place of business, where the owner has been for thirty or forty years."    So that the question presented for consideration is not merely what is possible under the act, but what is actually proposed to be done under it.    We must consider, therefore, whether the taking of such residue, not needed for the street, is a taking for a public use.

[2]    The statute requires the petition to state the object for which the condemnation is asked.    Code, sec. 3464.    The petition in this case states the object as "the opening and maintenance of a public street."    The opening of a public street is recognized everywhere as a public use, and the taking is not resisted as to so much of the land as is needed for the street.    It is resisted only as to what is termed the "excess condemnation."    As to the taking for the purpose of *"maintenance* of a public street," we know of no law to warrant it.

It has been urged upon us that "forward looking legislation has broadened State control over private property to meet social needs, and that the courts have likewise advanced, in sustaining the broadening legislation," and that

within the last half-century there has been a continued movement toward the enlargement of the powers of municipal corporations. Amongst other illustrations given are condemnations for public parks, boulevards and pleasure drives, public baths, playgrounds, libraries, museums and the like, and even for aesthetic purposes. No such use is proposed in the present case, and it is beside the mark to discuss it. What is here proposed is to condemn land not needed for the street, replat it and sell it to others, presumably at a profit, as no reason is assigned for the "excess condemnation," except that the city council is of opinion "that not to acquire all, or parts of the property on certain blocks, squares or lots, through which the said proposed street will pass, would render it impracticable, without extraordinary expense, to make the proposed improvement." The lot owners are no more concerned than other taxpayers of the city with the cost of opening the street, but they have the right to insist that their property adjacent to the street shall not be taken from them and sold at a profit, either to pay or to reduce the expense of opening the street. Such a transaction may be good financing on the part of the city, and greatly to its benefit, but such use of private property is not a public use. Public use and public benefit are not synonymous terms.

Counsel for the city has been affluent in his citation of cases and textbooks on the subject of "public use," and some of the cases thought by him to be most apposite will be hereinafter noticed, but none of them has gone to the extent here claimed. There have been a number of decisions in this State on the subject of what constitutes a public use, some of them of recent date, and while none of them involved the precise point now before us, they throw sufficient light upon the subject to guide us to a sound conclusion. We shall consider these first.

[3] While the question of the necessity, propriety or expediency of resorting to the exercise of the power of

50

eminent domain is a legislative function, in the absence of a constitutional inhibition (*Zircle* v. *Southern Ry. Co.*, 102 Va. 17, 45 S. E. 802, 102 Am. St. Rep. 805), what constitutes a "public use" is a judicial question to be decided by the courts. The legislature is forbidden to enact "any law whereby private property shall be taken or damaged for public uses, without just compensation," which in effect carries out the fundamental law of England and America that private property cannot be taken for private use, with or without compensation, but can *only* be *taken* for a public use. This inhibition, like other constitutional provisions, it is the duty of the courts to enforce. The legislature cannot conclude the constitutionality of its own enactments. *Miller* v. *Pulaski*, 109 Va. 137, 63 S. E. 880, 22 L. R. A. (N. S.) 552; *Jeter* v. *Vinton Water Co.*, 114 Va. 769, 76 S. E. 921, Ann Cas. 1914C, 1029; *Boyd* v. *Ritter Lumber Co.*, 119 Va. 348, 80 S. E. 273, L. R. A. 1917A, 94.

In *Roanoke City* v. *Berkowitz*, 80 Va. 616, 622, this court referring to the general statute on eminent domain which required the condemnation of the fee, and which was attacked as repugnant to the Constitution, said: "The Constitution imposes no other limitation on the power of the legislature in this particular than that contained in the clause which forbids the taking of private property for public use without just compensation; and the authorities all agree that under a general statute, like the one in question, no more can be rightfully taken, without the owner's consent, than the necessity of the case requires. Thus, where a part only of a man's land is needed for a courthouse or other public purpose, the necessity for the appropriation of that part will not justify the taking of the whole against his will, even though compensation be made therefor."

In *Fallsburg* v. *Alexander*, 101 Va. 98, 43 S. E. 194, 61 L. R. A. 129, 99 Am. St. Rep. 855, the subject of "public

use" is carefully considered and many authorities are cited to support the conclusion of the court, which is expressed in paragraph two of the syllabus, as follows: "A use to be public must be fixed and definite. It must be one in which the public, as such, has an interest, and the terms and manner of its enjoyment must be within the control of the State, independent of the rights of the private owners of the property appropriated to the use. The use of property cannot be said to be public if it can be gainsaid, denied, or withdrawn by the owner. The public interest must dominate the private gain."

· In the course of the opinion, Cooley's Constitutional Limitations is cited, with approval, for the statement, that "the public use implies a *possession, occupation and enjoyment of the land* by the public at large, or by public agencies; and the due protection of the rights of private property will preclude the government from seizing it in the hands of the owners and turning it over to another on vague grounds of public benefit to spring from a more profitable use to which the latter may devote it" (italics supplied) ; and section 165 of Lewis on Eminent Domain, for the statement that " 'Public use' means the same as use by the public, and this, it seems to us, is the construction the words should receive in the constitutional provision in question."

In *Miller* v. *Pulaski,* 109 Va. 137, 63 S. E. 880, 22 L. R. A. (N. S.) 552, the subject of "public use" is again discussed, and the powers and duties of the legislature and of the courts, respectively, are defined, and it was held that an act which authorizes a town to condemn land for the purpose of supplying the inhabitants of said town "or other persons, companies or corporations" with electric lights or power embraces an object which is constitutional with one which is unconstitutional, and where they are so united as to be inseparable, the whole grant of power is unconstitutional, and that the right to furnish lights or power to

"other persons, companies or corporations" is a private use, and where a private use is so combined with the public use that the two cannot be separated, the whole act is void.

The subject of "public use" is also discussed at length and a similar conclusion reached in *Jeter* v. *Vinton-Roanoke Water Co.*, 114 Va. 769, 76 S. E. 921, Ann. Cas. 1914C, 1029.

[4] In *Boyd* v. *Ritter Lumber Co.*, 119 Va. 348, 89 S. E. 273, L. R. A. 1917A, 94, many of the previous cases in this State, as well as cases from other States, are reviewed, and the conclusion stated is, that "public use" means a use by the public and that whether a particular use is public or not is a question for the judiciary and not for the legislature, and that the legislature cannot make a private use public by calling it so, in order to justify the exercise of the power of eminent domain. The opinion quotes with approval from *Bloodgood* v. *Mohawk*, 18 Wend. (N. Y.) 9, 31 Am. Dec. 313, as follows:

"When we depart from the natural import of the term 'public use' and substitute for the simple idea of a public possession and occupation that of public utility, public interest, common benefit, general advantage, or convenience, or that still more indefinite term 'public improvement,' is there any limitation which can be set to the exertion of legislative will in the appropriation of private property? The moment the mode of its use is disregarded and we permit ourselves to be governed by speculations upon the benefits that may result to localities from the use which a man or set of men propose to make of the property of another, that moment we are afloat without any certain principle to guide us.

\*          \*          \*          \*          \*          \*

"Mr. Lewis, in discussing this identical proposition, in section 165, after giving a history of the earlier decisions, concludes as follows: 'Public use means the same as use by

the public, and this, it seems to us, is the construction the words should receive in the constitutional provision in question. The reasons which incline us to this view are:

" 'First, that it accords with the primary and more commonly understood meaning of the words; second, it accords with the general practice in regard to taking private property for public use in vogue when the phrase was first brought into use in the earlier Constitutions; third, it is the only view which gives the words any force as a limitation, or renders them capable of any definite and practical application. If the Constitution means that private property can be taken only for use by the public, it affords a definite guide to both the legislature and the courts'."

In *School Board* v. *Alexander*, 126 Va. 407, 412-13, 101 S. E. 349, 351, it is said: "The taking of private property, however, is a matter of serious import and is not to be permitted except where the right is plainly conferred and the manner of its exercise has been strictly followed. There must be no doubt or uncertainty about the existence of the power. If it is not plainly conferred, it does not exist. The State may grant the power generally to condemn any property for a public use, or it may place such restrictions upon the power, the manner of its exercise, or the character of the property, that may or may not be taken as it pleases, and when such restrictions are imposed, they must be obeyed. If the limitations or restrictions involve public inconvenience, or retard the progress of public improvements, the remedy is an appeal to the legislature. They cannot be removed by judicial construction. The courts cannot enlarge a power which the legislature has restricted. *Charlottesville* v. *Maury*, 96 Va. 383, 31 S. E. 520; *A. & F. R. Co.* v. *A. & W. R. Co.*, 75 Va. 780, 40 Am. Rep. 743. It is said that, in the construction of statutes conferring the power of eminent domain, every reasonable doubt is to be solved adversely to the right; that the affirmative must be shown,

as silence is negation; and that unless both the spirit and letter of the statute clearly confer the power, it cannot be exercised. *Fertilizing Co.* v. *Hyde Park,* 97 U. S. 659, 666, 24 L. Ed. 1036; *Providence, etc., R. Co.* v. *Petitioner,* 17 R. I. 324, 21 Atl. 965, 972; *Ligare* v. *Chicago,* 139 Ill. 46, 28 N. E. 934, 32 Am. St. Rep. 179."

[5]   We have no disposition to curtail or embarrass the exercise of the power of eminent domain in proper cases, even if we had the power to do so, but the remedy is a drastic one and its application is restrained by the Constitution to those cases where the taking or damaging of private property is for "public uses." What is a "public use" is not a matter of discretion with the courts, but is one of sound judgment, under all the facts and circumstances of the particular case. Different courts sometimes arrive at different conclusions upon the same state of facts, but whenever the remedy is applied, it should always be because there is a direct "public use" of the property taken, and not a mere incidental or indirect public benefit.

We have not been referred to nor have we found any case directly in point  which upholds the contention of the city. The case of *State, ex rel., etc.* v. *Houghton,* 144 Minn. 1, 176 N. W. 159, 8 A. L. R. 585, much relied on by counsel for the city, involved the validity of a statute creating restricted residence districts in cities of the first class. The districts were established by the exercise of the power of eminent domain, and apartment houses, among other classes of buildings, were prohibited therein. It was held that the restrictions, as applied to apartment houses, were based upon a "public use," and that the statute providing for condemnation was valid. Upon the first hearing the statute was held to be invalid (see 144 Minn. 1, 174 N. W. 885), the court being divided three to two, but upon a rehearing the former decision was reversed, the court again standing three to two. The decision is rested largely on aesthetic grounds,

. and while we do not dissent from much that is said about the expansion and application of the term "public use," the majority holding is of no value to us in arriving at a proper conclusion upon the facts of this case, which are entirely different from the facts in that case.

In the petition for the writ of error, it is said, "for a case which is practically on all fours with the one in judgment, your petitioner cites with great confidence the case of *Bond* v. *Mayor, etc., of Balto.,* 116 Md. 683," 82 Atl. 978. Sec. 1 of the act there under review (Acts 1910, c. 110) gave the termini of the highway to be constructed, and authorized the city to "acquire for said purposes landed or other property in the bed of said highway and adjacent thereto on either or both sides thereof." In another section of the act it was provided, "That any landed or other property acquired under the provisions of this act, excepting lands lying in the bed of said highway, may, after said highway has been laid out, be sold by the mayor and city council of Baltimore, or said commission, if power to make such sales be, as it may be, delegated by ordinance to said commission for such prices, at such times and on such terms as may by ordinance be provided." Section 4. The court held that the words, "landed or other property acquired," mentioned in other sections than section one, manifestly refer and relate to landed or other property *acquired for the purposes set forth in section one;* that it clearly appears that the purpose for which the land is to be acquired is that of construction of the public improvement. In other words, that the land could only be acquired for the purpose of constructing the highway, and the court says that the validity of the power to acquire land adjacent to the highway on either or both sides thereof, incident to and for the *purpose of constructing the highway* and its connections has uniformly been upheld by the courts. This is far from being on all fours with the case at bar. It is

further said in the opinion in that case, that "it cannot be assumed in this case that the city will undertake to condemn or take property for purposes other than those authorized by the act. The presumption is that the city will act within its rights and not beyond them. It will be time enough to pass upon this question when it properly arises before us." In the case at bar, not only are we dealing with a statute under which "excess condemnation" is permitted, but are also confronted with a case in which the city is attempting to take from the owner his private property which confessedly is not needed for the proposed new street. The case cited cannot be accepted by this court as authority for the contention of the city in this case.

The cases from Massachusetts are more in accord with our views. In the business part of the city of Boston certain of the streets were narrow, non-parallel, and of tortuous nature, and there were a great number of small-sized and irregular shaped individual estates abutting on those streets, and under the exising statutes facilities could not be furnished for laying out and constructing new thoroughfares or streets and the sale or lease of such odd parcels or remnants of land as might be left in the hands of the public authorities if proper streets were laid out under the existing statutes. The city was anxious to provide broad and convenient thoroughfares for the transportation of goods and merchandise, and for the existence upon such thoroughfares of sites adequate in size and means of access, both front and rear, for the construction and use of warehouses, mercantile establishments, and other buildings suited to the needs of trade and commerce as then carried on in the principal cities of other States and other countries. The House of Representatives thereupon applied to the Supreme Judicial Court to know whether the legislature could authorize the city to exercise the right of eminent domain in connec-

tion with laying out proper streets and taking land adjoining outside of the proposed thoroughfares, with a view to conveying and leasing it to private individuals who might promote trade and manufacturing by the erection of suitable buildings on the land. This question the court answered in the negative, saying in part: "The proposed legislation to which the enquiry relates necessarily would contemplate action by the city in the procurement, management and control of lands along a street within the city, for no other purpose than to induce and promote a use of it by merchants or traders. It would contemplate a taking of private property in the exercise of the right of eminent domain and an expenditure of money to pay for it and fit it for occupation.

"It is a rule of law universally recognized in this country, that neither of these things can be done unless the taking or expenditure is for a public use. This has been stated so often, and the principles on which it is founded have been considered so fully, that it is unnecessary to discuss it or to cite authorities. The only question about which there is a possibility of doubt is whether the proposed use of the land outside of the thoroughfare is a public use. It is plain that a use of the property to obtain the possible income or profit that might enure to the city from the ownership and control of it would not be a public use. The city cannot be authorized to take the property of a private owner for such a purpose, nor can the city tax its inhabitants to obtain money for such a use. It could as well tax them to raise money to carry on any other private business with a hope of gain. Such proceedings are entirely outside the functions of a State or of any subdivision of a State."

After discussing the authorities to sustain the foregoing views, the court said further:

"An affirmative answer to this question would make it possible for the city to take the home of a resident near the

line of the thoroughfare, or the shop of a humble trades-man, and compel him to give up his property and go else-where, for no other reason than that, in the opinion of the authorities of the city, some other use of the land would be more profitable, and, therefore, would better promote the prosperity of the citizens generally. We know of no case in which the exercise of the right of eminent domain or the expenditure of public money has been justified on such grounds." *Opinion of Justices,* 204 Mass. 607, 91 N. E. 405, 27 L. R. A. (71 N. S.) 483.

This opinion was given March 4, 1910. Subsequently, the Senate propounded to the same court questions which the court says "differ but little in substance" from those pre-viously propounded by the House of Representatives. To the latter questions the court replied on April 10, 1910, and it is said in the petition in the instant case that this last reply "modified in no small degree the holding in the former opinion," and there is vouched in support of that conclusion a part of a sentence in the first syllabus of the case. No such conclusion can be properly drawn from the second opinion. The syllabus to the second opinion is fully sus-tained by the opinion, and in its integrity is as follows:

"It is not within the power of the legislature, in connec-tion with the widening of a highway or the laying out of a new highway in the city of Boston, to authorize that city to take by right of eminent domain real estate in excess of those parcels which in whole or in part are necessary for the highway itself, with a view to the subsequent sale by the city of such excess of real estate at its full value subject to restrictions or conditions designed to promote the commer-cial and industrial welfare and growth of the municipality by insuring an oportunity for the construction along such highway of buildings adapted to the requirements of com-merce, trade and industry and especially to the require-ments of those forms of business which to a large extent

employ teaming, thereby relieving, or helping to prevent the increase of, congestion of teaming traffic and so facilitating the transportation of freight and passengers through the section of the city in which such highway is to be widened or laid out.

"Although the legislature cannot authorize a city or town to take land outside a public work for the purpose of selling it, there may be, as contemplated by St. 1904, c. 443, sec. 6, a remnant of an estate, of which the greater part necessarily is taken for the public purpose, which is so small or of such a shape and of so little value that the taking of it in the interest of public economy or utility, or in some other public interest, may be fairly incidental to and reasonably necessary in connection with the taking of the greater portion of the land for the public work; but this exception cannot be extended so as to permit the taking of land outside the public work with a view to its sale afterwards in violation of the limitation of power stated above." *Opinion of Justices,* 204 Mas. 616, 91 N. E. 578.

In a still more recent case, decided June 21, 1913, it was held that private property cannot be taken ostensibly for a public use and then diverted to a private use, and that legislation so designed or framed as to permit such a result is invalid. *Salisbury Land & Imp. Co.* v. *Commonwealth,* 215 Mass. 371, 102 N. E. 619, 46 L. R. A. (N. S.) 1196.

[6]   We deem it unnecessary to cite further authorities. We concur with the judge of the Hustings Court of the city of Richmond that so much of the act of Assembly, approved February 29, 1916, found in the Acts of 1916, at pages 112-13, as is an amendment of the act of Assembly approved March 14, 1906, found in Acts of 1906, at page 317—said amendment now constituting the second and last paragraph of section 3065 of the Code—is unconstitutional, null and void, and so much of the joint resolution of the council of the city of Richmond, approved March 5, 1919, as was adopted in pursuance of said amendment is likewise invalid.

In the order made by the hustings court in this cause, it is ordered "that the title to the several parcels of land for which compensation and damages were allowed be and the same is hereby absolutely vested in the city of Richmond in fee-simple." The record does not disclose, and we have no means of knowing, whether or not the order applies to land outside of the lines of the proposed new street. If it does, the said order should be amended by said hustings court, in which the cause is still pending, as to the land lying outside of the lines of said street.

*Affirmed.*