## UNITED STATES ex rel. TENNESSEE VALLEY AUTHORITY v. WELCH and five other cases.
### Nos. 5373–5378.

Circuit Court of Appeals, Fourth Circuit.
July 21, 1945.

614

J. McCarthy, Asst. General Counsel, Tennessee Valley Authority, both of Knoxville, Tenn., on the brief), for appellant.

George H. Ward, of Asheville, N. C., and McKinley Edwards, of Bryson City, N. C. (G. Lyle Jones, of Asheville, N. C., on the brief), for appellees.

Before PARKER, SOPER and DOBIE, Circuit Judges.

PARKER, Circuit Judge.

These are appeals from judgments dismissing petitions of the Tennessee Valley Authority for the condemnation of certain tracts of land. The TVA seeks to acquire the lands in order that it may convey them to the Department of the Interior to be incorporated in the Great Smoky Mountains National Park, pursuant to a contract by which its liability for flooding a highway of the State of North Carolina is to be thus extinguished. The District Judge, being of opinion that the power of condemnation vested by Congress in the TVA did not authorize condemnation for such purpose, dismissed the proceedings, and the TVA has appealed.

There is no dispute about the facts. The TVA was created by Congress for the purpose of maintaining and operating the Muscle Shoals properties, improving navigation in the Tennessee River and controlling destructive flood waters in the basins of the Tennessee and Mississippi Rivers. 16 U.S.C.A. § 831. Under the powers granted it by the act, it constructed a large dam and reservoir on the Little Tennessee River in Western North Carolina known as the Fontana Dam and Reservoir. The filling of this reservoir flooded throughout most of its length North Carolina State Highway No. 288, which was the only highway serving the land lying between the Little Tennessee River and the Great Smoky Mountains National Park. There were 44,400 acres of this land and 216 families were living on it at the time.

None of the 44,400 acre boundary, except two or three acres, as to which there is no contest, was needed by the TVA for the purpose of constructing the dam or reservoir. All lay above the high-water level of the reservoir; and it was not proposed to take stone or timber from it or use it in any other way for any of the purposes for which the TVA had been created. It was admittedly being taken to be conveyed to the Department of the Interior to be incorporated in the Great Smoky

William C. Fitts, Jr., Sp. Counsel, Tennessee Valley Authority, of Knoxville, Tenn. (Thomas J. Griffin, Sol., and Charles

Mountains National Park, under a contract with the State of North Carolina and Swain County, as a means of extinguishing the liability of the TVA for flooding the highway.

The contract referred to arose out of the following circumstances: The territory served by Highway No. 288 was rough mountain land, and the construction of another highway in lieu of the one flooded would have been very expensive and priorities necessary to obtain the man power and materials for its construction would not have been available in war time. There was evidence that such highway would have cost $1,400,000, which was more than it would have cost to acquire the 44,400 acres and satisfy the State of North Carolina for closing the road, and probably a great deal more than any damages recoverable for the closing of the old highway. The 44,400 acres were lands that North Carolina had agreed to convey to the Great Smoky Mountains National Park but had not conveyed because funds for the purchase of park lands had been exhausted before these lands could be acquired. Officials of the state felt, however, that some obligation rested on the state with respect to the matter; and they proceeded to avail themselves of this opportunity to discharge the obligation and entered into a contract which would result in the deeding of the lands to the Park. That contract, to which the TVA, the State of North Carolina, Swain County and the Department of the Interior were parties, set forth its purpose fully in eleven "whereas" clauses, the last of which is as follows:

"Whereas, the parties hereto desire to provide for and agree upon the extension of the Park boundaries as aforesaid, the closing and ultimate replacement of Highway 288, and the immediate and final settlement and disposition of all claims which the State and the County may at any time have against the Authority or the United States of America by reason of the flooding, taking, or closing of said Highway 288 and the other roads hereinafter described or referred to, all in the manner and upon the terms and conditions hereinafter specified, and all to the end and purpose of avoiding unwise and inefficient expenditures of public funds and of capturing certain benefits for the region affected and the public generally."

The contract contained the following provisions: (1) That the TVA would acquire the 44,400 acres and deed it to the Department of the Interior to be included in the park, would save the state and county harmless from any claims for damages for the flooding of the highway, and would pay $400,000 to the State of North Carolina in trust for Swain County to be used in retiring bonds issued to finance the construction of the highway which had been flooded; (2) that the Department of the Interior would accept the 44,400 acres of land, include it within the boundaries of the Great Smoky Mountains National Park, and, after the war, and as soon as Congress should make the funds available, would construct a high grade parkway from a point near Fontana Dam to a point near Bryson City, N. C.; and (3) that the State of North Carolina would pay $100,000 to the TVA to aid in the purchase of the lands and would build certain roads to connect with the parkway when it should be constructed.

Pursuant to this contract, the TVA proceeded to acquire by purchase more than 38,000 acres of the land—all of the 44,400 acres, except the six tracts involved in these condemnation proceedings and certain lands, belonging to mining companies, which were excepted from the contract. One of the tracts not acquired but involved in these condemnation proceedings is a fishing and hunting preserve containing 4,500 acres lying at the eastern extremity of the 44,400 acres and adjoining the Great Smoky Mountains National Park. The others, with the exception of the 163 acre tract of the defendant Welch, also lie near the eastern boundary of the 44,400 acres. Welch and one Burns, another of the owners, have renounced all claims on account of the flooding of the road and ask nothing but that they be left alone in the enjoyment of their property.

The Board of Directors of the TVA passed resolutions to the effect that the condemnation of the property involved in these cases is necessary to carry out the purposes of the TVA Act. The position of its counsel in this court is that the courts are bound by the resolutions of the Directors; that the TVA Act imposes upon them the duty of determining what lands are necessary to carry out the provisions of the Act; and that they have determined that the lands here involved are necessary to the completion of the Fontana project "because their removal from private ownership is essential to the settlement of the Authority's legal liability to the State of

North Carolina." Defendants, on the other hand, point out that it is conceded that all of the lands in question are far removed from the high-water mark of the reservoir; that no part of the lands and no material located thereon will be used in the construction, operation or maintenance of the Fontana Dam project, and that immediately upon their acquisition the lands are to be conveyed to the Department of the Interior for incorporation in the Great Smoky Mountains National Park. Defendants accordingly argue that the lands are not being acquired for a public use for which the TVA is authorized to condemn private property, but to be used in making settlement of liability for flooding the state highway; that this is not a taking for the statutory project, but a taking in excess of what is needed for that purpose; and that such taking cannot be held a taking for a public use within the authority granted. We think, as did the judge below, that this position is well taken.

■ As pointed out above, the purpose of the creation of the TVA, so far as its relation to the Tennessee River is concerned, was the improvement of navigation and flood control in that river. Any condemnation of lands by it must have relation to this purpose; and we think that the power of condemnation is expressly so limited by the statute. The TVA seeks to spell out an almost unlimited power of condemnation from certain general powers granted it, such as the general power to purchase, lease and hold such real and personal property as it deems necessary or convenient in the transaction of its business, 16 U.S.C.A. § 831c (f), the general power to institute condemnation proceedings for the acquisition of land, easements and rights of way necessary to carry out the provisions of the Act, 16 U.S.C.A. § 831x, the power to cooperate with federal, state and local agencies in the readjustment of displaced populations, 16 U.S.C.A. § 831c (l), the power to negotiate and conclude contracts for the relocation of properties, enterprises and projects, 16 U.S.C.A. § 831q, and the general provision that the act shall be liberally construed, with provisos that no real estate shall be held except that necessary to carry out projects decided upon and that it shall dispose of other lands which it may acquire, 16 U.S.C.A. § 831dd. The power to acquire real estate for the construction of dams and reservoirs, however, is specifically covered by section 4(i) of the statute, 16 U.S. C.A. § 831c(i), which is as follows:

"(i) Shall have power to acquire real estate for the construction of dams, reservoirs, transmission lines, powerhouses, and other structures, and navigation projects at any point along the Tennessee River, or any of its tributaries, and in the event that the owner or owners of such property shall fail or refuse to sell to the Corporation at a price deemed fair and reasonable by the Board, then the Corporation may proceed to exercise the right of eminent domain, and to condemn all property that it deems necessary for carrying out the purposes of this Act, * * *."

■ The lands here in question are certainly not being taken for any of the purposes above enumerated in the statute. Their condemnation can be sustained only if they may be taken by the TVA for use in discharging a liability arising from the taking and flooding of the highway. This, we think, is taking, not for the public use for which the statute gives the right of condemnation, but for a private use, or at most for a public use not authorized by statute, and that the resolution of the Directors as to the necessity of the taking does not affect its character or justify the condemnation.

■■ It is well settled, of course, that, ordinarily, the necessity of a taking for public use is a legislative and not a judicial question and, when determined by the legislature, or by an agency created for that purpose, is not subject to review by the courts. Rindge Co. v. County of Los Angeles, 262 U.S. 700, 709, 43 S.Ct. 689, 67 L. Ed. 1186; Bragg v. Weaver, 251 U.S. 57, 58, 40 S.Ct. 62, 64 L.Ed. 135; Shoemaker v. United States, 147 U.S. 282, 13 S.Ct. 361, 37 L.Ed. 170; 18 Am.Jur. 734, 737. It is equally well settled, however, that "the nature of a use, whether public or private, is ultimately a judicial question." Rindge Co. v. County of Los Angeles, supra, 262 U.S. at page 705, 43 S.Ct. at page 692, 67 L.Ed. 1186; City of Cincinnati v. Vester, 281 U.S. 439, 446, 50 S.Ct. 360, 74 L.Ed. 950. Consequently, where property is taken in excess of that required for the authorized public use, the excess to be used for some other purpose, the courts have power so to declare. Cincinnati v. Vester, 6 Cir., 33 F.2d 242, 68 A.L.R. 831, and note at page 837, affirmed 281 U.S. 439, 50 S.Ct. 360, 74 L.Ed. 950; Warm Springs

Irr. Dist. v. Pacific Live Stock Co., 9 Cir., 270 F. 560; Wilton v. St. John's County, 98 Fla. 26, 123 So. 527, 65 A.L.R. 488; Richmond v. Carneal, 129 Va. 388, 106 S.E. 403, 14 A.L.R. 1341, and note at page 1350; Salisbury Land & Imp. Co. v. Com., 215 Mass. 371, 102 N.E. 619, 46 L.R.A.,N.S., 1196; Opinion of the Justices, 204 Mass. 607, 91 N.E. 405, 27 L.R.A.,N.S., 483. The rule is thus stated in 18 Am.Jur. 736, 737:

"It is a general principle that the legislature cannot authorize the taking of property in excess of that required for the public use, such excess to be sold or devoted to private use. The extent of that power is limited by the necessities of the particular public purpose or use for which the land is sought to be condemned. * * * The mere fact that the land may be resold at a profit whereby the expense of opening a street is reduced does not justify the excess taking. The taking of such excess land is not for a public use. Whether the particular use authorized is public is always a question for the judiciary."

In the case at bar, the only land which it was necessary for the TVA to take for the statutory project was the land covered by its reservoir. In taking this it flooded the highway affording access to the lands in question. This it had the right to do and to condemn the highway and any easements over it appurtenant to the lands to which it afforded access. To condemn the lands themselves, however, was excess condemnation, as they were not needed for any purpose authorized by the statute. Their condemnation cannot be justified as a means of satisfying the liability to the state and county for the flooding of the highway, since this is nothing more than taking private property, not for the statutory public use, but to satisfy an obligation incurred in taking property for such use. If a street railway should damage my property by destroying an easement of light and air, it would hardly be contended that this would give it the right to take the property to escape the payment of damages for the destruction of the easement. Nor would the right be any greater because it desired to transfer the property to another in extinguishment of a claim of damages for property taken from him.

What the TVA is proposing to do here cannot be distinguished in principle from what was condemned by the Supreme Court of Appeals of Virginia in the Carneal case, supra, where Mr. Justice Burks, in a noteworthy opinion, reviews the law and the decisions bearing on the matter. In that case the City of Richmond attempted to take portions of city blocks through which a new boulevard ran, although they were not needed for the boulevard itself. The attempted justification for this excess taking was that by replatting the lots and readjusting their lines and, presumably, selling them to others, the expense of the improvement could be reduced. In City of Cincinnati v. Vester, supra, the Circuit Court of Appeals of the Sixth Circuit condemned an excess taking for a similar purpose. Certainly the condemnation of land to be used in satisfying the state's claim of damages for the flooding of the road cannot be distinguished in principle from these cases which involved the taking of lands to be used in mitigating damages due to the opening or widening of streets. If the TVA, for the purpose of settling a claim for damages, can take land which it does not need for the public project in which it is engaged, no reason suggests itself why the land could not be taken and sold for the purpose of raising funds to satisfy the claim. The right of private property cannot be flouted in this way. As was well said in the case of Bloodgood v. Mohawk & H. River R. Co., 18 Wend., N.Y., 9, 31 Am.Dec. 313, 356, quoted in the opinion in the Carneal case [129 Va. 388, 106 S.E. 406]:

"When we depart from the natural import of the term 'public use' and substitute for the simple idea of a public possession and occupation, that of public utility, public interest, common benefit, general advantage, or convenience, or that still more indefinite term 'public improvement' is there any limitation which can be set to the exertion of legislative will in the appropriation of private property? The moment the mode of its use is disregarded and we permit ourselves to be governed by speculations, upon the benefits that may result to localities from the use which a man or set of men propose to make of the property of another, that moment we are afloat without any certain principle to guide us * * *."

The TVA relies upon Brown v. United States 263 U.S. 78, 44 S.Ct. 92, 94, 68 L.Ed. 171, in which was upheld the condemnation of land for the relocation of a town flooded by the building of a dam and reservoir. The court pointed out that the circumstances of the case were peculiar and that "a method of compensation by substitution

would seem to be the best means of making the parties whole" and that the power of condemnation was necessary to "such substitution." The court relied upon Pitznogle v. Western Maryland R. Co., 119 Md. 673, 87 A. 917, 46 L.R.A.,N.S. 319, in which it was held that a right of way could be taken by condemnation to substitute for another right of way closed as the result of a taking for public use; but the court was careful to distinguish the case from the Opinion of the Justices, supra, and that class of cases, holding that property may not be condemned and taken in connection with the opening of a street in order that it may be resold for the benefit of the public. Dohany v. Rogers, 281 U.S. 362, 50 S. Ct. 299, 74 L.Ed. 904, 68 A.L.R. 434, is another case holding that a right of way over other lands may be condemned to be furnished in lieu of a right of way taken. These cases go no further than to hold that the right of eminent domain may be exercised to obtain for another the sort of thing that has been taken from him by the exercise of the power. None of them hold that property of a different sort may be taken from others and given to him in satisfaction of his claim for damages. If the TVA here were attempting to exercise the right of eminent domain to obtain a right of way to build a road to take the place of the road flooded, there would be no question of its right. But when it attempts to condemn lands, not for a substitute roadway, but in order that it may convey them to a public park in order to obtain from the state a release of damages for flooding the road, a very different question is presented. No authority is cited which even remotely sustains such exercise of power, and we know of none.

Another case upon which the TVA relies is Old Dominion Land Company v. United States, 4 Cir., 296 F. 20, affirmed 269 U.S. 55, 46 S.Ct. 39, 70 L.Ed. 162, which is cited as approving a taking to save economic loss to the public. In that case, however, public buildings worth more than a million and a half dollars had been erected on land, worth only a fraction of that amount, which was held by the government under lease that was about to expire. This court held that, under the circumstances, condemnation of the land for the purpose of saving the buildings was for a public use. The Supreme Court, in affirming, based its decision on the ground that the courts must accept the purpose of the acquisition of the property as declared in the Act of Congress under which it was condemned. Nothing said in either opinion sustains what the TVA is attempting here.

We have discussed the case so far as though the carrying out of the contract into which the TVA has entered would result in a saving to the public. As a matter of fact the contract obligates the Department of the Interior to build a highway in the park, when public funds are available, at a cost of several millions of dollars, many times what it would cost to pay the damage resulting from the flooding of the old highway. This may be in the public interest, but it certainly constitutes no saving to the public and involves an expenditure of public funds and a condemnation of property for purposes far remote from those for which the TVA was created. North Carolina, if it sees fit, may condemn lands for the purpose of donation to the park. Yarborough v. North Carolina Park Commission, 196 N.C. 284, 145 S.E. 563, 569. And under the Weeks Law, 16 U.S.C.A. §§ 480, 500, 513 et seq., 552, 563, they may be condemned by the United States for park or forestry purposes where funds for their payment have been made available. Albert Hanson Lumber Co. v. United States, 261 U.S. 581, 587, 43 S.Ct. 442, 67 L.Ed. 809; United States v. Southern Power Co., 4 Cir., 31 F.2d 852, 856. The TVA, however, has no right to condemn them for such purpose; and for the reasons above stated, we do not think that it may do so merely because by so doing it can settle a liability for flooding a highway.

The judgments appealed from will be affirmed.

Affirmed.