# Richmond

ROBERT W. HUNTER AND EMILY BOWIE HUNTER V. NOR-
FOLK REDEVELOPMENT AND HOUSING AUTHORITY AND
THE CITY OF NORFOLK, A MUNICIPAL CORPORATION.

November 30, 1953.

Record No. 4171.

Present, All the Justices.

The opinion states the case.

*Jordan A. Pugh, III,* for the plaintiffs in error.

*Baird, White & Lanning, Jonathan W. Old, Jr.,* and *Leighton P. Roper,* for the defendants in error.

EGGLESTON, J., delivered the opinion of the court.

Norfolk Redevelopment and Housing Authority, hereinafter referred to as the Authority, filed its petition in the court below to condemn a lot of land with the buildings thereon numbered 300-306 Brambleton avenue, in the city of Norfolk, owned by Robert W. Hunter and Emily Bowie Hunter, hereinafter called the condemnees, and occupied by a number of tenants. The petition alleged that the property was needed in order to carry out a slum clearance and redevelopment plan which had been duly approved by the Norfolk city council and authorized by the Housing Authorities Law, as embraced in Code, §§ 36-1 to 36-55, both inclusive.

In their pleadings the condemnees challenged the constitutionality of the statutes under which the Authority was purporting to proceed. Moreover, they alleged that the Authority had not been legally constituted and that the redevelopment project had not been approved by the local authorities in the manner required by law. The City of Norfolk intervened to protect its interest in the matter.

The lower court overruled these legal objections raised by the condemnees, appointed commissioners, and confirmed their award of $14,000 for the property. To review the final judgment awarding to the Authority the fee simple title to and possession of the property the present writ of error was awarded. No question is raised as to the sufficiency of the award and we are concerned only with the legal questions raised by the condemnees in the lower court and renewed on this appeal.

The "Housing Authorities Law," as embraced in Code, §§ 36-1 to 36-55, is a codification of the Housing Act of 1938. Acts 1938, ch. 310, p. 446, as amended by Acts 1942, ch. 224, p. 316; Acts 1946, ch. 185, p. 276; Acts 1947, Ex. Sess., ch. 72, p. 138.

The declared purpose of the Housing Act of 1938, as defined in section 2 (Code, § 36-2), is to eradicate slum areas (defined in section 3) and provide "safe and sanitary dwelling accommodations for persons of low income." As a means of accomplishing this end, under section 4, a political subdivision of the Commonwealth, "known as the 'housing authority' of the city or county," is created in each city and county, with the proviso that it shall not transact any business or exercise its powers unless or until the governing body of the city or county, by appropriate resolution, shall declare that there is a need for such an authority to function in such city or county.[1]

After the governing body of the city has adopted a resolution declaring the need for an authority to function, the mayor is empowered by section 5 of the Act to appoint five persons as commissioners of the authority. Code, § 36-11.

Under section 12 of the Act an authority is given the right to acquire real property necessary for its purposes by eminent domain. Code, § 36-27.

Section 20 of the Act empowers the authority to borrow

[1] Code, § 36-4, embraces this section as amended by Acts 1946, p. 276; Acts 1947, Ex. Sess., p. 138.

money or accept contributions or other financial assistance from the Federal Government for or in aid of any housing project. Code, § 36-26.

An authority is given, under section 8, among others, the power "to lease or rent any dwellings, houses, accommodations, lands, buildings, * * * embraced in any housing project and * * * to sell, lease, exchange, transfer, assign, pledge or dispose of any real or personal property or any interest therein." Code, § 36-19.

The Acts of 1946, ch. 185, p. 276, made important amendments to the 1938 Housing Act. Section 4 was amended, as indicated in the title to the chapter, to provide that the political subdivisions which had been created and denominated "the 'housing authority' of the city or county," should be known as the "Redevelopment and Housing Authority." Code, § 36-4.[2]

The 1946 Act further added to the 1938 Act, among others, the sections with which we are immediately concerned. These may be summarized as follows:

Section 8-a is a finding and declaration "(a) that there exist in many communities within this Commonwealth blighted areas (as herein defined) which impair economic values and tax revenues, cause an increase in and spread of disease and crime, and constitute a menace to the health, safety, morals and welfare of the residents of the Commonwealth; (b) that the clearance, replanning, rehabilitation and reconstruction of such blighted areas and the sale or lease of land within such areas for redevelopment in accordance with locally approved redevelopment plans are necessary for the public welfare and are public uses and public purposes for which public money may be spent and private property acquired by purchase or the power of eminent domain, and are governmental functions of grave concern to the Commonwealth; * * * ." Code, § 36-48.

---

[2] By Acts 1947, Ex. Sess., ch. 72, p. 138, this section was further amended to provide that the Redevelopment and Housing Authority should carry the name of the particular city or county for which it was created.

Section 8-b defines undertakings constituting redevelopment projects which "any authority now or hereafter established" is empowered to carry out. Among these are:

"(1) To acquire blighted or deteriorated areas, which are hereby defined as areas (including slum areas) with buildings or improvements which, by reason of dilapidation, obsolescence, overcrowding, faulty arrangement of design, lack of ventilation, light and sanitary facilities, excessive land coverage, deleterious land use or obsolete layout, or any combination of these or other factors, are detrimental to the safety, health, morals, or welfare of the community;

  *   *   *   *   *   *   *

"(4) To clear any areas acquired and install, construct, or reconstruct streets, utilities, and site improvements essential to the preparation of sites for uses in accordance with the redevelopment plan;

"(5) To make land so acquired available to private enterprise or public agencies (including sale, leasing, or retention by the authority itself) in accordance with the redevelopment plan; or

"(6) To accomplish any combination of the foregoing to carry out a redevelopment plan." Code, § 36-49.

Under section 8-c, "In undertaking redevelopment projects an authority shall have all the rights, powers, privileges, and immunities that such authority has in connection with undertaking slum clearance and housing projects (including, * * * the power * * * to acquire real property by eminent domain or purchase, * * *)". Code, § 36-50.

Section 8-d provides:

"An authority shall not initiate any redevelopment project under this law until the governing body * * * of each city or town or county (hereinafter called 'municipalities') in which any of the area to be covered by said project is situated, has approved a plan (herein called the 'redevelopment plan') which provides an outline for the development or redevelopment of said area and is sufficiently complete (1) to indicate its relationship to definite local objectives

as to appropriate land uses and improved traffic, public transportation, public utilities, recreational and community facilities and other public improvements; (2) to indicate proposed land uses and building requirements in the area; (3) to indicate the land in the area to be made available to private enterprise for redevelopment and that land which is to be made available to public enterprise for redevelopment; and (4) to indicate the method for the temporary relocation of persons living in such areas; and also the method for providing (unless already available) decent, safe and sanitary dwellings in the locality substantially equal in number to the number of substandard dwellings to be cleared from said area, at rents within the financial reach of the income groups displaced from such substandard dwellings. Such municipalities are hereby authorized to approve redevelopment plans through their governing body or agency designated for that purpose." Code, § 36-51.

Under section 8-e any county, city or town is given the same rights and powers to cooperate with and assist authorities with respect to redevelopment projects that such county, city or town has pursuant to sections 23 and 24, and any other provision of the Housing Authorities Law, for the purpose of assisting the development or administration of slum clearance and housing projects. Code, § 36-52.

Under section 8-f, "An authority may make land in a redevelopment project available for use by private enterprise or public agencies in accordance with the redevelopment plan. Such land may be made available at its fair value, which represents the value (whether expressed in terms of rental or capital price) at which the authority determines such land should be made available in order that it may be developed or redeveloped for the purposes specified in such plan.

"To assure that land acquired in a redevelopment project is used in accordance with the redevelopment plan, an authority, upon the sale or lease of such land, shall obligate purchasers or lessees: (1) to use the land for the purpose

designated in the redevelopment plan; (2) to begin the building of their improvements within a period of time which the authority fixes as reasonable; and (3) to comply with such other conditions as are necessary to carry out the purposes of this Act. Any such obligations by the purchaser shall be covenants and conditions running with the land where the authority so stipulates." Code, § 36-53.

On July 30, 1940, pursuant to section 4 of the 1938 Act, the Norfolk city council adopted a resolution declaring that there was a "need for a Housing Authority to function in said city," notifying the mayor thereof, and directing him to appoint the necessary commissioners. The resolution further provided that the authority should be known as the "Housing Authority of the City of Norfolk." Pursuant to this resolution the president of the council, who under section 17 of the city charter[3] is ex officio the mayor, appointed five commissioners of the authority.

Under the terms of the 1946 and 1947 Acts (Acts 1946, ch. 185, p. 276; Acts 1947, Ex. Sess., ch. 72, p. 138) the name of the authority, which had been theretofore created under section 4 of the 1938 Act, was changed to "Norfolk Redevelopment and Housing Authority." By the terms of section 8-b of the 1946 Act (now Code, § 36-49), "Any authority now or hereafter established" was "specifically empowered to carry out any work or undertaking (hereinafter called a 'redevelopment project')."

Hence, there is no merit in the contention of the condemnees that the Norfolk Redevelopment and Housing Authority is not qualified to function because the city council has adopted no resolution, as required by Code, § 36-4, declaring that there was a need for an authority by that name to function. Any doubt as to the sufficiency of the resolution of July 30, 1940, was removed by· the validating provisions of section 8-b of the 1946 Act (now Code, § 36-49), *supra.*

We are further of opinion that contrary to the contention

---

[3] Acts 1918, ch. 34, p. 42.

of the condemnees, the president of the council, who, as has been seen, under the city charter is the mayor, was the proper person authorized by section 5 of the 1938 Act (now Code, § 36-11) to appoint the commissioners of the Authority.

Furthermore, by Acts of 1942, ch. 260, p. 381 (now Code, § 36-10), "The establishment and organization of housing authorities in the Commonwealth * * * under the provisions of the housing authorities law" of 1938 were validated and confirmed.

On August 10, 1951, after a public hearing the commissioners of the Authority adopted a resolution approving a "Redevelopment Plan for Project 1," and directed that it be transmitted to the council for approval. In transmitting the plan the chairman of the Authority wrote the council: "The proposed program of slum clearance and urban redevelopment would be carried out under sections 36-48 through 36-55 of the Code of Virginia, 1950, with financial assistance from the Federal Government under Title I of the Housing Act of 1949. The purpose is to clear predominantly slum and blighted areas and to redevelop them in a manner consistent with the sound needs of the community, with maximum opportunity afforded for the participation of private enterprise."

The plan contemplated the eradication of what is characterized as two of the worst "slum and blighted areas" in the city, covering about 127 acres. One area is bounded on the south by Brambleton avenue, on the east by the business district along Church street, on the west by the business district just west of Monticello avenue, and on the north by Cedar Grove Cemetery. The other area lies between Tidewater Drive on the west, the Norfolk and Western Railway on the east, Goff street on the north, and Ruffner Junior High School on the south.

Under the plan the Authority is to acquire the title to all of the privately owned land within the area either by purchase or condemnation and remove the buildings there-

from.  Certain streets and alleys in the area are to be vacated, others widened, and new streets opened.  The Authority is to convey to the city the land necessary for the widening of existing streets and the opening of others, and the sites for a new school building, fire station, and recreational facilities.  Of the total area, 33% is to be devoted to these municipal purposes; 25% is to be redeveloped as low-rent public housing buildings for occupancy by tenants; and the remaining 42%, being undesirable for residential purposes and not needed for municipal facilities, is to be redeveloped by private enterprise for commercial use consistent with the project.  Two-thirds of the cost of the project is to be defrayed by a grant from the Federal Housing Authority, and one-third by the city partially in cash and partially by the construction of public buildings, street improvements, sewerage lines, etc., in the area.

On August 21, 1951, the council, as required by Code, § 36-51, adopted a resolution approving the project and pledging the cooperation of the city in carrying it out.

On April 8, 1952, the council authorized the proper city officials to execute a written contract with the Authority, whereby the city agreed to acquire from the Authority, at stated amounts, the necessary land and to erect thereon a new elementary school and fire station, land for recreational facilities, and the necessary land for the widening and improvement of streets.  Under the terms of this agreement the city further agreed to construct certain streets, sewers, drains, etc., in the area and shown on the plan, and to take such other lawful actions as might be deemed necessary or desirable in carrying out the project.  This agreement was duly executed by the parties.

Thus, it clearly appears that the local governing body of the city has approved the project in the manner required by law, and is cooperating with the Authority in its execution.

The property of the condemnees lies wholly within

the slum area which the Authority proposes to acquire. It fronts 61 feet on the north side of Brambleton avenue which is the base of a triangle, the eastern side of which is Bank street and the western side of which is Monticello avenue. Under the plan a considerable portion of condemnees' property will be ultimately acquired and used by the city in the widening of Brambleton avenue, an arterial street. The remaining portion of condemnees' property, being just across the street from a principal business district, is deemed in the plan unsuitable for residential purposes and will be made available for commercial redevelopment by private enterprise, the exact nature of which has not yet been determined, but within the provisions of Code, § 36-53.

The main contention of the condemnees is that the redevelopment provisions of the law (Code, §§ 36-48 to 36-53, both inclusive) are an unconstitutional attempt to extend the police power of the State; that the taking of property under this statute is not for a public use permitted under section 58 of the Virginia Constitution, because under Code, § 36-53, an authority is empowered to "make land in a redevelopment project available for use by private enterprise"—that is, it may lease or sell the land acquired to private persons or agencies for redevelopment purposes. Thus, it is argued, the final result of the operation is to take the property from condemnees and give it to others.

It is, of course, true that property cannot be taken by the government without the owner's consent for the mere purpose of devoting it to the private use of another. It is also true, as the condemnees argue, that the legislative declaration in section 36-48, that the taking of property for the stated redevelopment purposes constitutes a public use, is not conclusive and is subject to judicial review. But such declaration is presumed to be right. *City of Richmond* v. *Dervishian*, 190 Va. 398, 405, 57 S. E. (2d) 120, 123.

The contention of the condemnees that the taking of their property is for private use misconceives the nature and

extent of the public purpose which is the object of this legislation. The primary purpose of the taking is the eradication of "blighted or deteriorated areas," "including slum areas," the reconstruction and rehabilitation of the areas, and the adaptation of them to uses which will prevent a recurrence of the blighted or slum conditions.

In *Mumpower* v. *Housing Authority*, 176 Va. 426, 11 S. E. (2d) 732, notwithstanding a similar constitutional attack, we held that the eradication of slum areas and the adaptation of the property to a low-cost housing project, to be leased to tenants, was a public use and a valid exercise of the police power of the State. In that case we further held that the provision of section 8(d) of the 1938 Housing Act (now Code, § 36-19(d)), empowering the authority "to sell * * * transfer * * * or dispose of any real * * * property or any interest therein," did not defeat the "public use" which occasioned the taking of the property. (176 Va., at page 456, 11 S. E. (2d), at page 744.) That is because such sale or transfer is merely incidental or collateral to the primary purpose of the Act. The same is true of the power of an authority to lease the housing units to tenants, likewise authorized by section 8(d) of the Act (Code, § 36-19(d)).

Similarly, under the provisions of the 1946 Act authorizing "Redevelopment Projects" (Code, § 36-48 *ff*.), the primary purpose is the elimination of blighted or slum areas, and the provision in Code, § 36-53, making property available for redevelopment by private enterprise is merely incidental to such main purpose. The Act contemplates that in the course of a large slum clearance operation there will be some sections which are not needed or suitable for long-range public use, and that after being purged of their unwholesome characteristics they will be returned to a restricted private use. Section 36-53 is designed to prevent a recurrence of the conditions which blighted the area by requiring that the land so sold or leased by an authority to private enterprise will be made subject to such restric-

tions and conditions as will carry out the purposes of the Act.

Similar legislation has been enacted by thirty-two States. Its constitutionality has been upheld against a similar attack by the highest courts of Alabama, Arkansas, Illinois, Maryland, Michigan, New Jersey, New York, Ohio, Oregon, Pennsylvania, Rhode Island and Tennessee.[4] Only the courts of Florida and Georgia have held to the contrary.[5]

The reasoning of the courts which have adopted the majority view is that the primary purpose of the legislation is the elimination and rehabilitation of the blighted and slum sections of the cities, that such purpose falls within the conception of public use, and that when the need for public ownership which occasioned the taking has terminated it is proper that the land be transferred to private ownership, subject to such restrictions as are necessary to effectuate the purposes of the act and prevent the recurrence of the unwholesome conditions. Such resale being, it is said, merely incidental to the primary purpose of the taking.

In both the Florida and Georgia cases cited in the footnote, which have taken the opposite view, the projects contemplated that after the slum conditions had been eradicated the entire areas were to be sold to private individuals for commercial development. In each instance the court seems to have taken the view that the primary pur-

---

[4] Opinion of the Justices (1950), 254 Ala. 343, 48 So. (2d) 757; *Rowe* v. *Housing Authority* (1952), 220 Ark. 698, 249 S. W. (2d) 551; *Chicago Land Clearance Comm.* v. *White* (1952), 411 Ill. 310, 104 N. E. (2d) 236; *Herzinger* v. *Mayor, etc. of Baltimore* (1953), — Md. —, 98 A. (2d) 87; *In re Slum Clearance* (1951), 331 Mich. 714, 50 N. W. (2d) 340; *Redfern* v. *Board of Commissioners of Jersey City* (1948), 137 N. J. L. 356, 59 A. (2d) 641; *Murray* v. *La Guardia* (1943), 291 N. Y. 320, 52 N. E. (2d) 884, certiorari denied 321 U. S. 771, 64 S. Ct. 530, 88 L. ed. 1066; *State* v. *Rich* (1953), 159 Ohio St. 13, 110 N. E. (2d) 778; *Foeller* v. *Housing Authority of Portland* (1953), — Or. —, 256 P. (2d) 752; *Belovsky* v. *Redevelopment Authority* (1947), 357 Pa. 329, 54 A. (2d) 277, 172 A. L. R. 953; *Ajootian* v. *Providence Redevelopment Agency* (1952), — R. I. —, 91 A. (2d) 21; *Nashville Housing Authority* v. *City of Nashville* (1951), 192 Tenn. 103, 237 S. W. (2d) 946.

[5] *Adams* v. *Housing Authority* (1952), — Fla. —, 60 So. (2d) 663; *Housing Authority* v. *Johnson* (1953), 209 Ga. 560, 74 S. E. (2d) 891.

pose of the plan was the commercial redevelopment of the area and not slum clearance. As the brief of the appellees here aptly characterizes these discredited projects, "Somewhere along the line, the cart went before the horse." In the case before us the project suffers from no such infirmity.

Much is said in the briefs filed on behalf of the con--demnees as to the socialistic tendency of this and similar legislation. It is argued that the eradication of slum and blighted areas and the rearrangement of city streets should be accomplished under the present zoning and health laws, coupled with the city's power of eminent domain. But these are matters of policy with which the courts are not concerned, for the wisdom of enacting laws is for the legislative and not the judicial branch of the government. Under our form of government the State Legislature is the supreme law-making body within the State and can enact any law not prohibited by the State or Federal Constitutions. 4 Mich. Jur., Constitutional Law, § 31, p. 114, and cases there cited. In our opinion, the statutes under consideration do not run counter to any constitutional provision.

Our conclusion here is not in conflict with the holding in *City of Richmond* v. *Carneal*, 129 Va. 388, 106 S. E. 403, 14 A. L. R. 1341. In that case we held that the city lacked the constitutional power to acquire by condemnation more property than was needed for street improvement and to sell the remainder to private individuals. That was so because there the public use was confined to such part of the property as was needed for street improvement. In the case before us, the public use requires the taking of the whole area, including the property of the condemnees, for slum clearance purposes, and a resale of a part for redevelopment purposes is merely ancillary to the main public use.

There is no constitutional requirement that property once acquired by the sovereign through condemnation may not

thereafter be sold to private individuals. In *City of Williamsburg* v. *Lyell*, 132 Va. 455, 461, 112 S. E. 666, we held that when public use of property acquired by a municipality has ceased the property may be sold or leased as the public welfare may demand.

The condemnees contend that they were unlawfully denied the right to introduce evidence to show that their property was not "blighted," or a slum, or "detrimental to the safety, health, morals, or welfare of the community," within the meaning of section 36-49. The answer to this argument is that the statute is designed to eradicate slum or blighted *"areas."* Consequently, if an area as a whole is subject to rehabilitation the condition of a single structure is immaterial. *Stockus* v. *Boston Housing Authority*, 304 Mass. 507, 24 N. E. (2d) 333, 337; *In re Edward J. Jeffries Homes Housing Project*, 306 Mich. 638, 11 N. W. (2d) 272, 275; *Blakemore* v. *Cincinnati Metropolitan Housing Authority*, 74 Ohio App. 5, 57 N. E. (2d) 397, 405; *In re Housing Authority of City of Charlotte*, 233 N. C. 649, 65 S. E. (2d) 761, 769; *Herzinger* v. *Mayor, etc. of Baltimore*, —— Md. ——, 98 A. (2d) 87, 94.

Here the proof consisting of photographs and oral testimony shows beyond question that the area within which the condemnees' property lies meets the statutory definition of a slum (Code, § 36-3, subsection (h)), or a blighted area (Code, § 36-49, subsection l). The lower court adjudicated that condemnees' property was "necessary for the uses and purposes" of the Authority, which is to say that it was within such an area.

After full consideration we find the other assignments of error also to be without merit. The judgment is

*Affirmed.*