## Richmond

RUDEE INLET AUTHORITY v. CHARLES W. BASTIAN, ET AL.

March 7, 1966.

Record No. 6124.

Present, All the Justices.

*James M. Pickrell (J. Frank Gallagher; James A. Johnson; Kellam & Kellam, on brief), for the appellant.*

*Robert R. MacMillan (E. Leslie Cox; Breeden, Howard & Mac-Millan, on brief), for the appellees.*

BUCHANAN, J., delivered the opinion of the court.

By its petition filed in the court below the appellant, Rudee Inlet Authority, sought to condemn the real property of the appellees in the city of Virginia Beach. In opposition the appellees filed a demurrer and a special plea to the petition. On consideration thereof, and on reasoning set forth in a written opinion, the court entered its decree adjudicating: (1) that the taking of private property for the uses and facilities authorized to be constructed by the Rudee Inlet Authority Act is for a public use for which the power of condemnation may be exercised; but (2) that provisions of the act granting the power to condemn would permit the taking of private property for private use and hence were illegal and unconstitutional. The petition was accordingly dismissed.

On this appeal the appellant assigned error to the second ruling and the appellees assigned cross-error to the first ruling.

The Authority was created by Acts 1960, ch. 227, p. 294, entitled: "An Act to create the Rudee Inlet Authority; to provide for the composition, government, powers, duties and liabilities thereof and other matters pertaining thereto; and to provide for the issuance of certain bonds thereby, and the terms and conditions of such issuance."

The act contains seventeen sections. Section 1 states that the Authority is a political subdivision of the Commonwealth, with such public and corporate powers as are granted by the act. Section 2 fixes the boundaries within which the Authority may exercise its powers in the city of Virginia Beach and Princess Anne county, and provides that in the exercise of the power of eminent domain conferred on it by the act, the Authority shall conform to the procedure set forth in Title 25 of the Code.

Sections 3, 4 and 5 provide that the Authority shall be governed by a commission of nine, selected as prescribed, and with officers as directed.

Section 6 lists the powers granted to the Authority, as will be referred to in detail below.

Section 7 authorizes Princess Anne county and the city of Virginia Beach to appropriate funds for the operation of the Authority. Sections 8 through 13 provide for the issuance of revenue bonds and matters related thereto.

Section 14 provides that the Authority shall fix rents and other

charges for the use of its facilities so as to provide funds for operations and to pay the bonds.

Section 15 grants the power to borrow money and to accept contributions from the federal government.

Section 16 forbids the use of any property of any political subdivision within its jurisdiction without prior consent; and Section 17 provides that the powers granted and the duties imposed shall be construed to be independent and severable.

The act does not, either in its title or in its text, state specifically the purpose of creating the Authority or clothe its powers with a declaration of public use. However, Section 6 provides that

"The Authority shall have the following powers:

\* \*

"(d) To acquire, lease, construct, improve, extend, maintain and operate, landings, wharves, docks, piers, jetties, yacht basins, marinas, facilities for yachts, boats and other watercraft and the approaches to and appurtenances thereof necessary or useful for the operation, navigation or maintenance of pleasure craft and fishing boats within the territorial limits of its jurisdiction."

The powers thus given to the Authority serve to define the character of its uses. As so defined these uses are for the purpose of establishing and operating structures and equipment in the nature of harbor facilities for the use, accommodation and convenience of the public.

We held in *Harrison* v. *Day*, 200 Va. 764, 107 S.E.2d 594, that the acquisition and development and operation of harbor facilities at Hampton Roads was a proper governmental function and hence for a public purpose.

In the case of *Opinion to the Governor*, 76 R. I. 365, 70 A.2d 817, a marina, defined as a yacht basin or pier, or combination thereof, with appropriate facilities for serving yachting and pleasure boats [which is one of the facilities listed in Section 6 (d), *supra*], was held to be for a public purpose or use in the constitutional sense. The court said:

"It seems to be well settled that ordinarily the development by a city of its harbor, including the building of docks and wharves, is a project in the public interest and constitutes a public use or purpose. \* \* In 1 Dillon, Municipal Corp., 5th Ed., 506, § 269, the following language appears: 'The *construction of docks and wharves*

*by a municipality for general public use is a public purpose* which justifies the exercise of the power of eminent domain.' * *"

Section 58 of the Constitution of Virginia provides that the General Assembly shall not enact any law whereby private property shall be taken or damaged for public uses without just compensation, "the term 'public uses' to be defined by the General Assembly." However, a declaration by the General Assembly [which we do not have here] that a contemplated use is a public one, is not conclusive and is subject to judicial review, but it is presumed to be right. *City of Richmond* v. *Dervishian*, 190 Va. 398, 405, 57 S.E.2d 120, 123; *Housing Authority* v. *Denton*, 198 Va. 171, 175, 93 S.E.2d 288, 291-2.

We attach the presumption of right in the present case to the legislative act which granted powers to the appellant of a character sufficient to describe a public use, there being nothing on the face of the pleadings to overcome the presumption. We affirm the holding of the trial court that the taking of private property for the establishment of the facilities described in the act creating the Rudee Inlet Authority is for a public use. See 29A, C.J.S., Eminent Domain, § 51, p. 289; 18 Am.Jur., Eminent Domain, § 68, pp. 697-8.

We consider next the holding of the trial court that paragraphs (c), (e) and (f) of Section 6 of the act constitute an unconstitutional and illegal grant of power to the Authority. They are as follows:

"§ 6. The Authority shall have the following powers:

"(c) To acquire by purchase, lease, or condemnation, real property, or rights, easements or estates therein necessary for its purposes; and to sell, lease and dispose of the same, or any portion thereof or interest therein;"

"(e) To prescribe and collect charges from pleasure craft and fishing boats coming into or using any landings, wharves, docks and piers, operated and maintained by the Authority and from persons using any of its other facilities, and to lease any and all of such facilities or any concessions properly incident thereto for the maintenance and operation of any or all thereof on such terms and conditions as it may deem proper;"

"(f) To construct for sale or lease, on such terms and conditions as it may deem proper, facilities and approaches to and appurtenances thereof;"

The test of the constitutional validity of a statute is what may be

done under it, what it permits, *Boyd* v. *Ritter Lumber Co.*, 119 Va. 348, 357, 89 S.E. 273, 275; *Richmond* v. *Carneal*, 129 Va. 388, 392, 106 S.E. 403, 405; *NAACP* v. *Harrison*, 202 Va. 142, 162, 116 S.E.2d 55, 70-1; *Howard* v. *School Board*, 203 Va. 55, 59, 122 S.E.2d 891, 894.

Section 6 (c) of the act gives power to condemn real property "necessary for its purposes," without declaring what may be included in that phrase; and to sell, lease and dispose of the property so condemned, or any part of it, for any reason or no reason.

Section 6 (e) gives the Authority power to prescribe and collect charges for the use of any of its facilities, and to lease all of such facilities to whom it chooses on such terms as it may deem proper.

Section 6 (f) gives the Authority power to construct "for sale or lease," on such terms and conditions as it may fix, it facilities with their approaches and appurtenances.

There is nothing in the act to prevent these powers and privileges from being exercised with respect to any property condemned by the Authority, or indeed to prevent property being condemned for the purpose of selling or leasing it to private individuals for such use as the purchaser or lessee desires.

Appellees say in their brief that under the provisions of the act their home and property may be taken by the Authority and leased or sold without restriction to private entrepreneurs for any private use. The possibilities under the powers given to the Authority by the terms of the act furnish ground for that statement.

As pointed out in *Boyd* v. *Ritter Lumber Co.*, *supra*, both the Constitution of Virginia (§ 58) and the Constitution of the United States (Art. 5) forbid the taking of private property for public uses without just compensation, and "it has been universally held that the spirit of both constitutions is in conflict with the view that private property can be taken for private uses under any conditions or stipulations." 119 Va. at 351-2, 89 S.E. at 274.

In *Richmond* v. *Carneal*, *supra*, the portion of an act of the General Assembly which permitted a municipality to condemn more land than was necessary for opening or widening a street, and then to replat and dispose of the unused part, " 'making such limitations as to the uses thereof as it may see fit' " was held to be unconstitutional. It was there said: "What is here proposed is to condemn land not needed for the street, replat it and sell it to others, presumably at a profit * *.   * * Such a transaction may be good financing on

the part of the city, and greatly to its benefit, but such use of private property is not a public use. Public use and public benefit are not synonymous terms." 129 Va. at 390, 393, 106 S.E. at 404, 405. The opinion approved this statement from the syllabus in *Fallsburg* v. *Alexander*, 101 Va. 98, 43 S.E. 194, 61 L.R.A. 129, 99 Am. St. Rep. 855:

"A use to be public must be fixed and definite. It must be one in which the public, as such, has an interest, and the terms and manner of its enjoyment must be within the control of the State, independent of the rights of the private owner of the property appropriated to the use. The use of property cannot be said to be public if it can be gainsaid, denied, or withdrawn by the owner. The public interest must dominate the private gain."

This is not to say, of course, that property which has been legally taken by condemnation cannot be disposed of when it is no longer needed for the public purpose for which it was taken, or when a leasing or sale is in furtherance of or incidental to the purpose for which it was initially taken. The distinction is illustrated in the recent Housing Authority cases, among others.

In *Mumpower* v. *Housing Authority*, 176 Va. 426, 11 S.E.2d 732, the contention was made that the provision of the 1938 Housing Act granting the Authority the power to sell, transfer or dispose of any of its real property, constituted the taking of the property for a private use and not a public purpose, and was therefore unconstitutional. The contention was overruled because the sale or transfer in that case was incidental or collateral to the primary purpose of the act.

In *Hunter* v. *Redevelopment Authority*, 195 Va. 326, 78 S.E.2d 893, we held that the public purpose of the 1946 Housing Act (Code §§ 36-48 *ff.*) was not destroyed by a provision making land in a redevelopment project available for use by private enterprise because this power was merely incidental to the main purpose of the act. It was said in the opinion that thirty-two states had enacted similar legislation and that

"The reasoning of the courts which have adopted the majority view [that the legislation was constitutional] is that the primary purpose of the legislation is the elimination and rehabilitation of the blighted and slum sections of the cities, that such purpose falls within the conception of public use, and that when the need for public ownership which occasioned the taking has terminated it is proper

that the land be transferred to private ownership, subject to such restrictions as are necessary to effectuate the purposes of the act and prevent the recurrence of the unwholesome conditions. Such resale being, it is said, merely incidental to the primary purpose of the taking."

It was also said in the *Hunter* case:

"* * The Act contemplates that in the course of a large slum clearance operation there will be some sections which are not needed or suitable for long-range public use, and that after being purged of their unwholesome characteristics they will be returned to a restricted private use. * *"

There is nothing in the Rudee Inlet Authority Act to suggest that a similar situation was contemplated with respect to the power given to the Authority to lease or sell the land condemned by it. There is no restriction in the act to the effect that the sale or leasing of the land condemned by the Authority for public use shall only be in furtherance of or incidental to the main purposes of the act or no longer needed for the public use. As said in the trial court's opinion:

"Under the powers conferred by the Act, the Authority could acquire private property by condemnation one day and the next day lease or sell it unconditionally, or 'on such terms and conditions as it may deem proper,' to a private party * *."

* *

"Any such unconditional lease or sale would be, in effect, the exercise of the power of eminent domain for private use, not public use. It would be completely repugnant to the fundamental principle of eminent domain—private property may be taken by the state only for public use."

The Rhode Island court in *Opinion to the Governor, supra,* speaking of a subsection of the Rhode Island Act which gave the Authority the power to lease the marina "so that it shall be self-liquidating," said:

"* * The power thus granted, not being otherwise defined or limited, in our opinion gives the development authority in effect absolute power to lease the entire project. So construed it is our judgment that the portion of the act relating to the leasing of the marina is invalid and unconstitutional, since in substance it would permit the spending of public money and the exercise of the right of eminent domain to acquire private property ostensibly for a public

purpose but actually for profit in the operation of the marina as a private enterprise. * *"

The case of *Harrison* v. *Day*, 202 Va. 967, 121 S.E. 2d 615, referred to in the briefs, was not concerned with the question of eminent domain. It held that since the acquisition, development and operation of the port and harbor facilities was a proper governmental function, as had been previously decided, "the leasing of the enterprise to another by express legislative authority as the agency to do and perform the things which the Authority was created to accomplish, does not change the character of the enterprise."

We hold that the powers of eminent domain granted to the Authority by § 6 (c), (e) and (f) go beyond constitutional limitations and are unconstitutional, and that the appellant's petition for condemnation was properly dismissed.

The decree appealed from is accordingly

*Affirmed.*

CARRICO and GORDON, JJ., concurring in part and dissenting in part.

CARRICO, J., concurring in part and dissenting in part.

I agree that the decree of the trial court should be affirmed because the powers of eminent domain, granted in the Rudee Inlet Authority Act, go beyond constitutional limitations and are unconstitutional. I would go further. I would sustain the assignment of cross-error and hold that the establishment of the facilities described in the Act is not for a public purpose and that the whole Act thus goes beyond constitutional limitations and is unconstitutional.

I take this position for what, to me, is a very obvious reason. There is nothing in the Act to indicate that the facilities, when established, are to be held and operated for use by the public. So far as the Act is concerned, not only may private property be taken by eminent domain for private use, as the majority holds, but public funds, as well, may be expended for private use and the enjoyment of the facilities be limited to a select few.

While the decision of the majority will prevent the Authority from condemning private property and putting it to private use, there is nothing to prevent the Authority from acquiring private property, with public funds, *by purchase or lease* and putting it to

private use. This the Authority may do, so far as the Act and the majority opinion are concerned, either by operating the facilities as a private yacht club itself or by selling or leasing the facilities to a private owner who could operate them as a private venture for his personal profit.

The situation here is quite different from that in the case of *Opinion to the Governor*, 76 R. I. 365, 70 A. 2d 817. There the act creating the authority contained a declaration of public purpose. The fact that the marina there authorized was to be for use by the public was of significant importance. It was stated, "The promotion of service to the public is considered to be the primary object of such a development." And, quoting 1 Dillon, Municipal Corp., 5th Ed., 506, § 269, the court said, "The *construction of docks and wharves by a municipality for general public use is a public purpose. . . .*"

The act before the Rhode Island court provided for that *general public use* which is of such crucial importance in situations like this. The act before us does not provide for such general public use and there is nothing in the Act to indicate that "promotion of service to the public" is a primary object of the development authorized, as was true in the Rhode Island case.

I cannot equate the establishment of the facilities here in question with the development and operation of harbor facilities that concerned us in the case of *Harrison* v. *Day*, 200 Va. 764, 107 S. E. 2d 594. I see little comparison between the small facility here envisioned for the enjoyment of the limited class owning pleasure craft and the development of major harbor facilities for general public use, through which food, fuel and the other necessities of life may flow freely in the stream of commerce.

The majority opinion states that a declaration by the General Assembly that a contemplated use is a public one is presumed to be right. I heartily agree. But the majority opinion admits that the Act before us does not contain such a declaration as, indeed, it does not. Nonetheless, the majority opinion attaches the presumption of rightness to this Act because the powers granted to the Authority are "of a character sufficient to declare a public use." With that I disagree.

The mere fact that the Authority is empowered to construct facilities for pleasure craft is not enough to sustain the validity of the Act. The facilities here contemplated to be established can be, and ordinarily are, best provided by private enterprise.

An examination of the powers granted to the Authority discloses,

with but one real exception, that the Authority is going to be performing the same function as any private yacht club incorporated in this state. That one exception is the power to acquire property by condemnation, and that power has now been taken away from the Authority.

Without the usual, necessary declaration of public use, the Act is entitled to no presumption of rightness. Stripped of that presumption, the Act stands before us in the bare bones of its invalidity. I am of opinion that the Act never drew the first breath of constitutional life, and we should not now attempt to breathe life into it.

GORDON, J., concurring in part and dissenting in part.

I agree with everything said in the separate opinion of Mr. Justice Carrico. My additional words go to the Rudee Inlet Authority's power to conduct various business operations in competition with private enterprise.

The act creates the Authority by these words: "There is hereby created a political subdivision of the Commonwealth, with such public and corporate powers as are granted in this act, to be known as the Rudee Inlet Authority . . ." (§ 1). The powers granted to the Authority under § 6 of the act are powers that may be possessed by any private corporation, with one exception: the power of eminent domain granted under § 6(c) of the act.[1] The purposes of the Authority are nowhere described in the act. So no restriction of the Authority's powers was accomplished by the words "necessary for its purposes", running through § 6 of the act—if, indeed, any restriction was intended.

The majority concludes that the power to construct and operate facilities for watercraft "serve[s] to define the character of its [the Authority's] uses", and "[a]s so defined these uses are . . . for the use, accommodation and convenience of the public." I disagree, for reasons given in Mr. Justice Carrico's opinion. Furthermore, the range of the Authority's permissible activities is much broader than the construction and operation of facilities for watercraft.

---

[1] By comparing § 6 of the act with Va. Code Ann. § 13.1-3 (Repl. vol. 1964), we see that, apart from the power of eminent domain, the powers granted to the Authority are powers granted by general law to each stock corporation of Virginia, except that the powers granted under clauses (d) through (g) of § 6 are not specifically described in Code § 13.1-3. Those specific powers are appropriate, however, for exercise by a private corporation, particularly a corporation that operates a marina.

The Authority alleged in its petition "[t]he property to be taken in this proceeding is necessary for the construction, improvement, extension, maintenance and operation" of watercraft facilities and motels. The majority affirms the dismissal of the petition, but only because of the Authority's power to sell or lease the property after acquiring it. The majority finds no constitutional prohibition against the Authority's engaging in the business of operating a motel.

All powers conferred upon the Authority by the act may be exercised within an area in the borough of Virginia Beach beginning at the ocean front and comprising approximately twelve square miles (§ 2). With powers like those possessed by any corporation organized for profit, the Authority can compete with an indeterminate number of persons engaged in private business within that area and in adjoining areas. As is apparent from a reading of § 6 of the act, the Authority's activities are not restricted to the operation of facilities for watercraft—the public purpose inferred by the majority—or to operations reasonably incident thereto.[2]

In my opinion, the act violates § 185 of the Constitution of Virginia because it permits "the State [to] become a party to or become interested in . . . [a] work of internal improvement . . ." This opinion is not contrary to that expressed in *Harrison* v. *Day*, 200 Va. 764, 107 S.E.2d 594 (1959). We held § 185 inapplicable to the Virginia State Ports Authority because the act creating that Authority dedicated it to governmental functions. What has been said in these concurring and dissenting opinions should be sufficient to explain why I believe the Rudee Inlet Authority is not so dedicated.

---

[2] For example, there is no restriction upon the type of facility that may be constructed by the Authority pursuant to the power granted under § 6 (f) "To construct for sale or lease, on such terms and conditions as it may deem proper, facilities and approaches to and appurtenances thereof." A "facility" has been defined as "something that promotes the case of any action, operation, transaction, or course of conduct—usu. used in pl. (excellent *facilities* for graduate study)" (Webster's Third New International Dictionary, p. 812).