PRESENT:  All the Justices

HOFFMAN FAMILY, L.L.C., ET AL.

v.  Record No. 052506    OPINION BY JUSTICE BARBARA MILANO KEENAN
                                        September 15, 2006
CITY OF ALEXANDRIA


                 FROM THE CIRCUIT COURT OF THE CITY OF ALEXANDRIA
                            Lisa B. Kemler, Judge


     In this appeal, we determine whether a city lawfully

initiated condemnation proceedings to relocate a storm water

sewer as part of its public utility system on the ground that

the condemnation was necessary for development of a particular

area under the city's comprehensive plan.

     We state the evidence in the light most favorable to the

City of Alexandria (the City), the prevailing party in the

circuit court.  Stanley v. Webber, 260 Va. 90, 92, 531 S.E.2d

311, 312 (2000); Bayliner Marine Corp. v. Crow, 257 Va. 121,

126, 509 S.E.2d 499, 502 (1999).  This case concerns property

that is adjacent to the City's Eisenhower Avenue Metro station.

In 2003, the City adopted the Eisenhower East Small Area Plan

(Eisenhower area plan), a part of the City's comprehensive plan

adopted pursuant to Code § 15.2-2223.  The City wanted to create

high-density economic development near the Metro station

consisting of retail, residential, and commercial uses.  The

City also planned to have these uses supported by open space,

recreational entertainment, and cultural amenities.  The City's

design objective was to "encourage a system of streets and

blocks which provides for an urban framework for the area" and

to "establish an urban design character for Eisenhower Avenue"

as a "major urban boulevard."

Hoffman Family, L.L.C., Peggy L. Hoffman, Hubert N.

Hoffman, III, and Linda L. Hoffman (collectively, Hoffman), own

several parcels of property, as well as air and surface

easements, located in the Eisenhower East section of the City.[1]

The Mill Race project, approved by the Alexandria City Council

(the city council) as a component of the Eisenhower area plan,

is a proposal developed by the Trammell Crow Company, an owner

of land adjacent to Hoffman's property.[2]  The Mill Race

development proposal includes one apartment building, one

condominium building, and one commercial office building.  The

_____

[1] The City initiated separate proceedings against Hoffman
Family, L.L.C., owner of land and easements of one parcel of the
property at issue, and against Peggy L. Hoffman, Hubert N.
Hoffman, III, and Linda L. Hoffman, co-owners of separate
property interests affected by the City's proposed action.
After Hoffman Family, LLC and the individual co-owners filed
pleas in bar, the circuit court issued an order consolidating
the two cases.  Because the pleadings filed by the parties prior
to the consolidation are substantively identical, this opinion
shall hereafter refer to the respondents collectively as
Hoffman.

[2] After the City's attempted condemnation of Hoffman's land,
the Trammell Crow Company sold its interest in the property to
Paradigm Development Company, another private developer.

proposal for each building includes plans for retail establishments located on the ground floor.

A storm water box culvert (box culvert) is located on the site of one building planned for the Mill Race project. The box culvert, which is a part of the City's storm water sewer system that extends underground in the area of the properties at issue, is a concrete structure designed to convey storm water from land surfaces to an outfall downstream.

The present controversy arose when the City decided it was necessary to relocate the box culvert. The City determined that it was impractical to allow construction of a building over the box culvert on the Mill Race site because "maintenance of the storm water structures may require the use of heavy equipment, which may not be able to access portions of the storm water culvert where buildings are constructed over the culverts."

The City planned to relocate the box culvert to a site on Hoffman's property on the south side of Eisenhower Avenue. Under the City's plan, this placement would allow the storm water sewer to run primarily under Mill Race Lane and Grist Mill Place, two new public streets being constructed in conjunction with the Eisenhower area plan.

The proposed relocation required acquisition from Hoffman of two temporary construction easements covering a combined area of 8,434 square feet, and the permanent acquisition of 1,009

3

square feet of Hoffman's property for the storm drain easement. In accordance with Code § 25.1-417, the City attempted to purchase the affected property from Hoffman but was unable to reach agreement on a price. Thereafter, the City, asserting its statutory powers of condemnation, filed petitions in the circuit court to condemn these portions of Hoffman's property.

In its condemnation petitions and in the City Council's resolution authorizing the condemnation, the City stated that the property and temporary construction easements would be used for construction, maintenance, and repair of a sewer system that was "necessary . . . (1) to implement the Eisenhower East Small Area Plan Chapter of the 1992 Master Plan (1998 ed.) of the City of Alexandria, (2) to promote the orderly and proper development of the Eisenhower East Small Area Plan area, and (3) to permit the development of the Mill Race project as approved by CDD Concept Plan No. 2002-0001 and DSUP Nos. 2002-0002 and 2002-0003."

In response to the petitions in condemnation, Hoffman filed a plea in bar, arguing that the City's attempt to take a portion of Hoffman's property to relocate the storm sewer line was "solely for the benefit of the private owner of [adjoining] land." Hoffman asked that the circuit court declare the attempted condemnation invalid because there was neither a public purpose nor a public necessity for the takings.

4

Hoffman also filed a motion requesting a jury trial on the issues raised in its plea in bar. The circuit court denied the request and conducted a bench trial to resolve the issues presented in Hoffman's plea.

The evidence at trial showed that the decision to relocate the box culvert followed the City's preferred practice of locating all public utilities, including sewers, along and under public streets. Emily Baker, City Engineer for the City of Alexandria, testified that the City prefers to locate sewers along public streets to permit maintenance of the sewers without any potential conflicts from private landowners. However, Baker acknowledged that the City also wanted to relocate the box culvert to allow construction of a building at the box culvert's present location. Baker further agreed that the existing box culvert was functioning properly, was in good repair, and had sufficient capacity to serve the area in which it functioned.

Eileen P. Fogarty, Director of Planning and Zoning for the City, testified that the street grid system in the Eisenhower area plan and the Mill Race project was a matter of high priority to the City. Fogarty explained that the street grid system would help achieve the City's goal of creating a pedestrian community in the area, while also enhancing general safety and fire truck access and providing significant traffic circulation benefits. Fogarty also stated that the relocation

of the sewer and box culvert from the existing location was one of the benefits of the Mill Race project identified by her staff in its recommendation supporting the issuance of the special use permit for the project.

Richard Baier, Director of Transportation and Environmental Services for the City, confirmed much of Fogarty's testimony. Baier stated that the discussion of a grid pattern of streets for the Eisenhower East area began long before the plan for the Mill Race project emerged. Baier acknowledged, however, that a road grid could have been constructed while leaving the old box culvert in place.

After hearing all the evidence, the circuit court overruled Hoffman's plea in bar. The circuit court concluded that the purpose of the taking was to "facilitate proper storm water runoff into the City's storm sewer system." The circuit court held that the City's action was for a public use, "[r]egardless of any incidental benefit that may flow to the developer of [the Mill Race site] by the movement of the existing storm sewer box culvert." The circuit court further explained:

> The fact that the underlying motivation for the relocation of the storm sewer box culvert is the implementation of the [Eisenhower area plan] and to promote the orderly and proper development of the [plan] in accordance with the Small Area Plan and the Special Use Permits approved for Mill Race does not, in this Court's view, diminish the public use of the taking.

6

Following its decision overruling Hoffman's plea in bar, the circuit court held a hearing on the issue of just compensation. William R. O'Neill, who qualified as an expert in the field of real estate appraisal, testified that $53,400 was the total value of the property interests taken by the City. After hearing this evidence, the circuit court entered a final order awarding Hoffman $53,400 as compensation for the land and easements taken by the City. This appeal followed.

We first consider Hoffman's argument that the circuit court erred in denying its request for a jury trial on the plea in bar. Hoffman observes that the Constitution of Virginia provides a right to trial by jury in all actions at law, including condemnation proceedings. Hoffman further notes that Code § 8.01-336(D) provides a right to a jury determination of a plea in bar raised to an equitable claim. Hoffman contends that a plea in bar filed in an action at law should not be treated differently from a plea in bar to an equitable claim, particularly because jury trials are guaranteed in actions at law while jury trials are not guaranteed with regard to most equitable claims. We disagree with Hoffman's argument.

There is no constitutional or statutory authority providing for a jury trial on a plea in bar in a condemnation proceeding. Moreover, in Code § 25.1-219, the General Assembly has directed that the circuit court in condemnation proceedings determine

7

"issues or other matters in controversy, excepting the issue of just compensation or matters relating to the ownership of any land or other property or the interests of any party in such land or other property."  The circuit court's duty to decide the matters in controversy other than those specified in that statute complements the provisions of Code §  25.1-220, which state that when the proper parties have appeared or responded to the petition in condemnation, the issue of just compensation shall be determined by a jury unless the parties agree to have the court make that determination.[3]

These statutes illustrate the particular care that the General Assembly has given to the mode of determining all issues that may arise during the course of a condemnation proceeding. In specific language, the General Assembly has reserved for decision by the court those issues that do not involve the question of just compensation or the determination of ownership or other interests in the property sought to be condemned. Therefore, we hold that the circuit court properly determined that Hoffman did not have a right to a jury trial on the issue raised in its plea in bar.

---

[3] Effective July 1, 2006, commissions no longer serve as an alternative mechanism for determining issues of just compensation.  Such determinations may only be made by a jury, or by the circuit court on agreement of the parties.  See Code § 25.1-220.

We next consider Hoffman's argument that the circuit court erred in concluding that the City sought to condemn Hoffman's property for a public purpose. Hoffman contends that there is no evidence to support the circuit court's finding that the "purpose of the taking" was "to facilitate proper storm water runoff." According to Hoffman, the City decided to condemn the property to allow Mill Race's developers to construct a building that met certain planning goals the City wanted to accomplish in that area. Hoffman asserts that under the holding in Phillips v. Foster, 215 Va. 543, 211 S.E.2d 93 (1975), the power of eminent domain may not be exercised for the private purpose of improving land at a neighbor's expense. Such a private purpose, Hoffman maintains, is at issue in this case because, "but for" the Mill Race project, there was no need or plan to relocate the box culvert.

Hoffman further alleges that the comprehensive plan considerations cited in the City's resolution do not provide a basis for the City's exercise of its power of eminent domain. Hoffman observes that with the exception of blighted property, which is not at issue here, there is no statutory authority granting local governments the power to condemn property to

achieve planning goals.[4] Hoffman further notes that under Code § 15.2-2307, a local government cannot rezone property in violation of vested property rights. Thus, according to Hoffman, because local governments are prohibited from impairing vested property rights in exercising zoning powers, those localities likewise do not have authority to condemn property for planning purposes. We disagree with Hoffman's analysis and arguments.

In resolving this issue, we first review the constitutional and statutory authority of a city to condemn property for public purposes. Our review of these provisions is guided by certain established principles of construction.

The statutes confirming the power of eminent domain must be strictly construed, and a locality must comply fully with the statutory requirements when attempting to exercise this right. Commonwealth v. Klotz, 245 Va. 101, 104, 425 S.E.2d 508, 510 (1993); Schmidt v. City of Richmond, 206 Va. 211, 217, 142 S.E.2d 573, 577 (1965). We consider the language of each statute at issue to determine the General Assembly's intent from the plain and natural meaning of the words used. Britt Constr., Inc. v. Magazzine Clean, LLC, 271 Va. 58, 62, 623 S.E.2d 886, 888 (2006); West Lewinsville Heights Citizens Ass'n v. Board of

---

[4] Code §§ 36-2 and 36-49.1:1 authorize a local government to condemn "blighted areas" for redevelopment. However, the City did not proceed under these statutes.

10

Supervisors, 270 Va. 259, 265, 618 S.E.2d 311, 314 (2005). When the language of a statute is unambiguous, courts are bound by the plain meaning of that language. Alcoy v. Valley Nursing Homes, Inc., 272 Va. 37, 41, 630 S.E.2d 301, 303 (2006); Williams v. Commonwealth, 265 Va. 268, 271, 576 S.E.2d 468, 470 (2003).

The Constitution of Virginia (the Constitution), in Article I, Section 11, guarantees that private property shall not "be taken or damaged for public uses, without just compensation." This section further provides that the term "public uses" shall be defined by the General Assembly. Id.

The General Assembly set forth that definition in Code § 15.2-1900, which specifies that the term "public uses" found in Article I, Section 11 of the Constitution "is hereby defined to embrace all uses which are necessary for public purposes." Although the term "public purposes" is not defined in Code § 15.2-1900, the plain language of the term as set forth in the statute refers to the object of a particular use of land, and whether that object fairly can be categorized as "public" in nature. See Webster's Third New International Dictionary 1847 (Unabridged ed. 1993) (defining the noun "purpose" as "something that one sets before himself as an object to be attained").

11

The General Assembly has given local governments broad power to acquire land for public utility uses.  Under Code § 15.2-2109, a local government may

> Acquire . . . whatever land may be necessary for . . . locating, establishing, maintaining, operating, extending or enlarging waterworks, sewerage, . . . stormwater management systems and other public utilities, and the rights-of-way, . . . pipes, poles, conduits or wires connected therewith, or any of the fixtures or appurtenances thereof.

When a local government seeks to acquire land for such public uses by employing its power of eminent domain, the locality must comply, among other things, with the provisions of Code § 15.2-1903(B), which require the adoption of a resolution or ordinance approving the proposed public use and authorizing the condemnation.  The resolution or ordinance must be adopted before the condemnation petition is filed.  Id.

The required content of such a resolution or ordinance is also specified in Code § 15.2-1903(B).  As provided by that statute, "[t]he resolution or ordinance shall state the use to which the property shall be put and the necessity therefor." Id. (emphasis added).

These two components of a locality's condemnation resolution, namely, the specification of a public use and the statement of necessity for the proposed use, have been the subject of numerous decisions of this Court.  We consistently have emphasized the different character of these two components.

12

Over 85 years ago, in City of Richmond v. Carneal, 129 Va. 388, 393-94, 106 S.E. 403, 405 (1921), we explained that "the question of the necessity, propriety or expediency of resorting to the exercise of the power of eminent domain is a legislative function, in the absence of a constitutional inhibition." We also stated that "what constitutes a 'public use' is a judicial question to be decided by the courts." Id. at 394, 106 S.E. at 405; accord City of Richmond v. Dervishian, 190 Va. 398, 405, 57 S.E.2d 120, 123 (1950); Mumpower v. Housing Auth. of Bristol, 176 Va. 426, 448, 11 S.E.2d 732, 740 (1940); Light v. City of Danville, 168 Va. 181, 208, 190 S.E. 276, 287 (1937).

Courts do not inquire into the issue of a locality's good faith in initiating condemnation proceedings if the locality's purpose is clearly stated in the resolution or ordinance. Light, 168 Va. at 197, 190 S.E. at 282. Thus, condemnation proceedings are not decided based on "the purposes and plans that may be hidden in the minds of the [locality] undertaking to condemn for a public purpose, but by the validity of what is to be done and may be done as shown by the record in the proceedings." Id.

Likewise, courts will not review a locality's statement of necessity describing the locality's reasons for initiating a condemnation proceeding, unless the locality has arbitrarily or capriciously exercised its discretion or there is evidence

13

showing manifest fraud.[5]  Stewart v. Highway Comm'r, 212 Va. 689, 692, 187 S.E.2d 156, 159 (1972); see Hamer v. City of Chesapeake, 240 Va. 66, 70, 393 S.E.2d 623, 625 (1990); Light, 168 Va. at 196, 190 S.E. at 282.  As we explained in Light,

> a condemnation proceeding is not subject to collateral attack upon the question of the wisdom of the construction of a public improvement, or the means, or the manner in which such improvement is to be constructed, or the economic soundness of the proposition.  The decision of such questions lies within the judgment of the [locality] proposing to enter into and effectuate the public purpose.

168 Va. at 196, 190 S.E. at 282.

The judicial question of what constitutes a "public use" is well established.  As we stated in Carneal:

> A use to be public must be fixed and definite.  It must be one in which the public, as such, has an interest, and the terms and manner of its enjoyment must be within the control of the State, independent of the rights of the private owners of the property appropriated to the use.

129 Va. at 395, 106 S.E. at 406; accord Ottofaro v. City of Hampton, 265 Va. 26, 31-32, 574 S.E.2d 235, 237-38 (2003); Town of Rocky Mount v. Wenco of Danville, Inc., 256 Va. 316, 322, 506 S.E.2d 17, 21 (1998); Rudee Inlet Auth. v. Bastian, 206 Va. 906, 911, 147 S.E.2d 131, 135 (1966); Mumpower, 176 Va. at 448, 11 S.E.2d at 740; Light, 168 Va. at 196, 190 S.E. at 282; Nichols

---

[5] Hoffman does not allege that the City arbitrarily or capriciously exercised its discretion when it initiated the condemnation proceedings, nor does Hoffman allege the existence of fraud.

14

v. Central Virginia Power Co., 143 Va. 405, 415-16, 130 S.E. 764, 767 (1925). The public interest in the use of the land to be condemned must dominate any private gain in the use of that land. Ottofaro, 265 Va. at 32, 574 S.E.2d at 238; Wenco, 256 Va. at 322, 506 S.E.2d at 21; Phillips, 215 Va. at 547, 211 S.E.2d at 96; Light, 168 Va. at 201, 190 S.E. at 284.

The determination whether a locality's intended use of property to be condemned qualifies as a "public use" must be made upon consideration of the facts and circumstances of the particular case. Carneal, 129 Va. at 398, 106 S.E. at 407. The public remedy of condemnation will be upheld when there is a direct "public use" of the property taken, rather than a mere incidental or indirect public benefit. Id.; see Ottofaro, 265 Va. at 31-32, 574 S.E.2d at 237-38; Wenco, 256 Va. at 322, 506 S.E.2d at 21. Thus, as instructed by Carneal, our inquiry must focus on the use of the land taken, not on the use of neighboring properties.

The fact that a locality has filed with its petition of condemnation a copy of its resolution stating that the property will be taken for public use does not bar judicial review of this fundamental inquiry. Ottofaro, 265 Va. at 31, 574 S.E.2d at 237; Rudee Inlet Auth., 206 Va. at 909, 147 S.E.2d at 134. Therefore, we must determine whether the presumed public use stated in the City's resolution, namely, that of storm water

15

utility use, qualifies as a "public use," within the meaning of Code § 15.2-1900.

Foremost in our analysis is the fact that the General Assembly has granted localities express statutory authority to condemn land for purposes of locating sewers and storm water management systems. See Code § 15.2-2109. A legislative declaration that an intended use is a public one, although not conclusive, is presumed to be correct. Infants v. Virginia Housing Dev. Auth., 221 Va. 659, 669, 272 S.E.2d 649, 655 (1980); Dervishian, 190 Va. at 405, 57 S.E.2d at 123.

Our decision in Dervishian is particularly helpful on the subject of private benefit and whether a particular use qualifies as a "public use." There, the City of Richmond had adopted a resolution authorizing condemnation proceedings to acquire certain property for the purpose of developing a public parking lot. The resolution stated that the action was necessary "to relieve congestion in the use of streets and to reduce hazards incident to such use." 190 Va. at 403, 57 S.E.2d at 122. An owner of property in the same area sought an injunction to restrain the City of Richmond from further action alleging, among other things, that the proposed taking was not for a public use because the lot would primarily benefit two department stores in the area. Id. at 404-07, 57 S.E.2d at 123-24.

16

We held that the parking lot was a use expressly contemplated by the city charter, and that the purpose of such use, to provide parking space for vehicles off the city streets, was plainly a public purpose. Id. at 405-06, 57 S.E.2d at 123-24. We explained that "[t]he fact that property acquired to serve the public may also incidentally benefit some private individuals does not destroy the public character of the use." Id. at 407, 57 S.E.2d at 124.

Our holding in Dervishian emphasizes the principle that the focus of a public use inquiry must be on the property to be acquired by condemnation, not on its effect on neighboring properties. Thus, if the record supports a conclusion that the property proposed for condemnation will be a public use acquired for a public purpose, the fact that neighboring property owners will benefit from that use is irrelevant.

Applying these principles, we conclude that the circuit court correctly held that the City sought to condemn Hoffman's property for a public use. The box culvert qualifies as a public use because it is designed to function as a component part of the City's storm water sewer management system, a use specifically identified in Code § 15.2-2109 as one for which a locality may acquire "whatever land may be necessary." The record further shows that construction of the box culvert on the condemned property will provide the City better access for

17

maintenance and will permit the City to place its connecting sewer line primarily underneath public streets.

Because there will be no private use of the condemned property, the issue of private benefit to nearby properties is irrelevant. Thus, like the public parking lot in Dervishian, the box culvert in the present case retains its character as a public use, irrespective of the fact that a neighboring property owner may benefit from the City's exclusive use of the condemned property.

Hoffman's contrary argument alleging private benefit to the Mill Race project is additionally without merit because it confuses the City's declaration of necessity with the public purpose of the box culvert use. The City's resolution states that the storm water sewer easements are necessary to permit development of the Eisenhower East area and the Mill Race project in accordance with the City's comprehensive plan, its Eisenhower area plan, and other City plans and permits.

This declaration of necessity is not a statement of public purpose and does not alter the character of the box culvert as a public use. Rather, the declaration of necessity sets forth the City's reasons supporting its legislative determination that a box culvert is necessary at this location. We will not review the City's determination of necessity because it reflects a

18

legislative decision.[6]  See Hamer, 240 Va. at 70, 393 S.E.2d at 625-26; Carneal, 129 Va. at 393-94, 106 S.E. at 405.  Also, as we have explained, "there is no constitutional right to a hearing on the issue of necessity."  Hamer, 240 Va. at 70, 393 S.E.2d at 626.

Our holding is not affected by Hoffman's challenge to the circuit court's finding that the "purpose of the taking" was "to facilitate proper storm water runoff."  This finding, although lacking evidentiary support, was merely ancillary to the court's ultimate conclusion that a box culvert built and controlled by the City as part of its storm sewer system is a public use.  Moreover, the record contains manifest evidence of the public purpose of the proposed use, namely, the City's operation of this sewer system component.

Finally, we find no merit in Hoffman's argument that the principles enunciated in Phillips v. Foster preclude the City's condemnation of Hoffman's property.  There, we held unconstitutional as applied a statute permitting private property owners to condemn for their own use the private

---

[6] Hoffman's rezoning and vested rights analogy also is inapplicable to the present case because the analogy is based on governmental action affecting the future private use of private property, not on governmental action providing for the public use of property as part of a public utility system based on a legislative determination of necessity.

19

property of another.  Phillips, 215 Va. at 544, 211 S.E.2d at 94.

In that case, certain developers sought to condemn an easement across adjoining property to provide drainage for their proposed private housing subdivision.  Id. at 544, 211 S.E.2d at 94.  We focused our review on the question whether there was a public use of the land to be condemned that predominated over the developers' private use of the land.  We held that the taking was unconstitutional because it was predominantly for a private use.  Id. at 547, 211 S.E.2d at 96.

In reaching this conclusion, we emphasized that the terms "public benefit" and "public use" are not synonymous.  In a condemnation proceeding, the appropriate consideration is whether a public use predominates, not whether a public benefit may result.  Id. at 547, 211 S.E.2d at 96.  The term "public use" connotes a possession, occupation, and enjoyment of the land by the general public, or by public agencies.  Id.

In the present case, Hoffman's argument improperly focuses on whether there is a public benefit to be derived from the condemnation, rather than the true issue whether the property will be taken for a predominantly public use.  Here, unlike the private use of condemned property that we invalidated in Phillips, the City's proposed use of the condemned property is exclusively a public use that will function as part of the

20

City's storm water sewer system.  Accordingly, we hold that the City's proposed use of the condemned property is a public use because regardless of any incidental benefit to adjoining property owners, the condemned property will be used exclusively as part of a public utility system built and controlled by the City.[7]

For these reasons, we will affirm the circuit court's judgment.

*Affirmed.*

CHIEF JUSTICE HASSELL, with whom JUSTICE KOONTZ joins, dissenting.

I.

I respectfully dissent because I am of the opinion that the majority applied an incorrect test when determining whether public benefit to the City of Alexandria dominated the private gain to the developer.

---

[7] We also note that the United States Supreme Court's holding in Kelo v. City of New London, ___ U.S. ___, 125 S.Ct. 2655 (2005), is not applicable to the case before us.  In Kelo, the Court held that a Connecticut statute, which authorized a locality to condemn private property and redistribute that property to a private developer in order to achieve the locality's purported public use of promoting economic development, did not violate the Fifth Amendment of the United States Constitution.  In contrast to the facts presented in Kelo, the condemnation of Hoffman's property will not involve any private occupancy or dominion of the land, and the City will enjoy exclusive ownership and control of the property. Additionally, we observe that the holding in Kelo was based exclusively on the United States Constitution, which is not at issue in this appeal.  Id. at 2668.

21

II.

The City Council for the City of Alexandria approved the Eisenhower East Small Area Plan, which is a part of the City's comprehensive plan enacted pursuant to Code § 15.2-2223. The City desired to create a high-density economic development near the Eisenhower Avenue Metro Station. The Eisenhower East Small Area Plan includes retail, residential, and commercial uses. The area would also have open space, recreational, entertainment, and cultural amenities. Several parcels of land, known as Mill Race, are within the Eisenhower East Small Area Plan.

Hoffman Family, L.L.C., Peggy L. Hoffman, Hubert N. Hoffman, III, and Linda L. Hoffman (hereafter collectively referred to as Hoffman), own commercial real estate in the area within the Eisenhower East Small Area Plan. Trammell Crow Company, an owner of land adjacent to the Hoffman property, is the developer of the Mill Race project. The Mill Race project includes a high-rise residential apartment building, a condominium building, and a commercial office building.

The developer desired to construct a multi-story residential apartment building on one of the developer's parcels in Mill Race, but that parcel was encumbered by an existing storm water easement improved by an underground box culvert. The culvert is a large concrete structure, four feet by six

22

feet, designed to convey storm water from upstream properties to an outflow in a stream channel downstream.  The developer of Mill Race attempted to negotiate with the City of Alexandria to obtain permission to build a high-rise residential building on top of the existing box culvert, but the City rejected the developer's request because of concerns related to the maintenance of the culvert.  The developer approached Hoffman and inquired about the possibility of relocating an existing storm water culvert onto a portion of Hoffman's property.

The developer was unsuccessful in its efforts to relocate the box culvert on Hoffman's property.  During a meeting with the City Manager of Alexandria, the Director of Planning and Zoning, the developer, and other City officials, a discussion ensued regarding whether the developer could acquire an easement for the relocation of the culverts from Hoffman.  The minutes of the meeting contained the following summary:

> "The meeting began with a discussion on the box culvert relocation.  Mr. Sherman [developer's representative] started the discussion by noting how critical the covenant is related to the streets and how development of the parcels was dependent on it. He voiced a concern that Hoffman would be able to extract more as time goes on.  Mr. Viola [developer's representative] commented that Hoffman had received the paperwork from the City Attorney's office and was currently reviewing it, although it looked like what had been requested had been provided.  He brought up the point that if the box culvert has to be moved, an easement would be needed for the realignment, since it would have to cross the Hoffman and ATA properties. Mr. Rak noted that the streets within the project

23

would be dedicated to the City. He commented that a discussion with SP? would take place regarding the realignment of the culvert and utilities, although moving the utilities would not impact the Hoffman development. Mr. Rothmeyer emphasized that a signed document would be needed sooner rather than later, since it would be harder to get Hoffman to sign as the project moves along because he will have greater leverage. He voiced concern about any additional time it would take, since the City had taken so [much] time on the covenant issue. [The city manager] commented that the City would force the issue and that it would not take as long as the covenant because it is a public issue instead of a private one."

Emily Baker, the City Engineer for the City of Alexandria, testified during the condemnation proceedings that "[b]ut for the Mill Race project, there were no plans to relocate that box culvert." The existing box culvert was functioning properly, and it was in good repair. The existing box culvert was expected to function properly for an additional 20 to 70 years. The existing box culvert had sufficient capacity to serve the area that drained into it. Baker testified as follows:

"Q: It [the current box culvert] had sufficient capacity to serve the area which drained into it?
"A: Yes.
"Q: And in fact, there was no intrinsic need to relocate that box culvert other than the desire to put a building on top of there?
"A: Yes.
"Q: There was no engineering necessity to move that box culvert other than the fact that Mill Race was going to put a big building where Building No. 1 is shown?
"A: There would be no reason to move the sewer if there were not construction on top of it."

24

She also acknowledged that the proposed new box culvert would have less capacity than the present box culvert. Baker further testified that a grid pattern of streets that the City desired to create in the vicinity of the Eisenhower East Small Area Plan could have been accomplished without an easement on the Hoffman property.

Additional expert testimony confirmed that the relocation of the box culvert onto Hoffman's property will actually decrease the capacity of the storm water system. The new box culvert is exactly the same size as the existing culvert, but because the new box culvert contains "bends and turns," it has less capacity than the existing box culvert. The bending of a storm water system decreases its hydraulic capacity.

Richard Baier, the City's Director of Transportation and Environmental Services, testified as follows:

> "Q:  Before the Mill Race project came along, there were no plans to relocate the box culvert?
> "A:  That's correct."
>
>         . . . .
>
> "Q:  Well, then, straight to the chase, what generated the need to relocate the box culvert and the placement of a building on top of it?
> "A:  That's correct.
> "Q:  Not the road grid.
> "A:  The road grid provided a place just like Eisenhower Avenue provided a place for the sanitary sewer. The road grid provided a place for the relocation of the storm sewer."

Emily Baker testified as follows:

"Q: Are you aware of any other time the City has asked someone to relocate a perfectly good operating facility just because a street was built nearby?

. . . .

"A: I'm not aware of any only because a street was nearby.

"Q: The real reason as you stated earlier was, they wanted to put a building on top.

"A: That's right."

There are many locations in the City of Alexandria where utilities are not constructed in a street.

The developer of Mill Race could have relocated the box culvert on its property without impacting the Hoffman property. Baier testified as follows:

"Q: From an engineering standpoint, you're an engineer, the developers of Mill Race could have relocated the box culvert in their property without touching the Hoffman property?

"A: That's correct. That would have been less preferable, but that's correct."

The City claimed that it prefers that public utilities, such as storm sewer box culverts, are located in public streets when possible, even though the existing culvert involved in this litigation is not so situated. The City presented testimony that it prefers the location of the sewer in the street because that location provides continuity of service, easier maintenance, and less disruption during maintenance. With the creation of new streets, the City will be able to relocate the storm sewer box culverts onto public streets.

26

The condemnation resolution that the City Council adopted does not contain any language that suggests that the City condemned Hoffman's property for reasons related to the improvement or construction of a sewer discharge system. The only purported public purposes stated within the resolution are the development of the Mill Race project and the implementation of the Eisenhower East Small Area Plan. In response to an interrogatory that Hoffman propounded to the City during this litigation requesting that the City state all facts upon which it relied in asserting that the taking was for a public use, the City did not identify any uses related to the improvement or construction of the sewer system; rather, the City only identified goals related to economic development.[*]

If the culvert is not relocated onto the Hoffman's property, the developer of Mill Race would have to reduce the building design of the high-rise apartment by 60,000 square feet

---

[*] Over the course of this litigation, the City has shifted the focus of its public use argument from the benefits of economic development to the alleviation of maintenance concerns. As previously stated, the condemnation resolution and the City's response to Hoffman's interrogatory focused on the secondary effects of economic development. At trial, counsel for the City argued that the imposition of the street grid was the "driving factor" which led to the City's decision to relocate the box culvert, and that "the developer's net gain is a nonexistent thing." On appeal, the City argues that "the significant planning and zoning benefits to the City flowing out of the implementation of the Eisenhower East Small Area Plan and the Mill Race development only buttress the public benefits of having greater control over the storm sewer."

of buildable area.  This reduction in square footage would reduce the value of the building to the developer by at least $2,090,000.  The developer of Mill Race has agreed to reimburse the City for all condemnation expenses that the City incurs, including legal expenses.

III.

This Court, for over 100 years, has repeatedly held that private property can only be condemned if that property is to be taken for a public use.  We stated in Fallsburg v. Alexander, 101 Va. 98, 102-03, 43 S.E. 194, 196 (1903):

> "Whenever the public use of property requires it, the private rights of property must yield to this paramount right of sovereign power to take it for the public use.  When so taken, it is the character of the use for which the property is taken, and not the means or agencies by which it is taken, which determines the question whether it is legally taken under the legitimate exercise of the right of eminent domain, but in all cases the use for which it is proposed to take private property in the exercise of this right must be a public use, or for a public purpose, and this . . . is a question for judicial determination."

"[T]he issue 'whether a taking is for a public purpose is a judicial question, reviewable by the courts. . . .' "  Ottofaro v. City of Hampton, 265 Va. 26, 31, 574 S.E.2d 235, 237 (2003) (quoting Hamer v. School Bd. of Chesapeake, 240 Va. 66, 70, 393 S.E.2d 623, 625 (1990)); accord City of Richmond v. Carneal, 129 Va. 388, 394, 106 S.E. 403, 405 (1921) ("What constitutes a

28

'public use' is a judicial question to be decided by the courts.").

The principles we must apply to ascertain whether a landowner's property was taken for public use are well-established.  We have repeatedly stated that

> "the public use implies a possession, occupation, and enjoyment of the land by the public at large, or by public agencies; and a due protection to the rights of private property will preclude the government from seizing it [from] the hands of the owner, and turning it over to another on vague grounds of public benefit to spring from the more profitable use to which the latter may devote it."

Phillips v. Foster, 215 Va. 543, 547, 211 S.E.2d 93, 96 (1975); accord Ottofaro, 265 Va. at 31-32, 574 S.E.2d at 237-38.  This Court has consistently held that:

> "A use to be public must be fixed and definite. It must be one in which the public, as such, has an interest, and the terms and manner of its enjoyment must be within the control of the State, independent of the rights of the private owner of the property appropriated to the use.  The use of property cannot be said to be public if it can be gainsaid, denied, or withdrawn by the owner.  The public interest must dominate the private gain."

Rudee Inlet Auth. v. Bastian, 206 Va. 906, 911, 147 S.E.2d 131, 135 (1966).

This Court has also held, without equivocation, that "[t]he public interest must dominate any private gain."  Ottofaro, 265 Va. at 32, 574 S.E.2d at 238.  We have applied this fundamental principle in this Commonwealth for over 100 years.  Town of

29

Rocky Mount v. Wenco of Danville, Inc., 256 Va. 316, 322, 506 S.E.2d 17, 21 (1998); Rudee Inlet Auth., 206 Va. at 911, 147 S.E.2d at 135; Mumpower v. Housing Auth. of Bristol, 176 Va. 426, 448, 11 S.E.2d 732, 740 (1940); Light v. Danville, 168 Va. 181, 201, 190 S.E.2d 276, 284 (1937); Nichols v. Central Va. Power Co., 143 Va. 405, 416, 130 S.E. 764, 767 (1925); Carneal, 129 Va. at 395, 106 S.E. at 406; Miller v. Town of Pulaski, 109 Va. 137, 142, 63 S.E. 880, 882 (1909).  See also Phillips, 215 Va. at 547, 211 S.E.2d at 96; Norfolk County Water Co. v. Wood, 116 Va. 142, 145-49, 81 S.E. 19, 20-22 (1914); Jeter v. Vinton-Roanoke Water Co., 114 Va. 769, 778-79, 76 S.E. 921, 925 (1913); Fallsburg, 101 Va. at 109, 43 S.E. at 198.

We have applied the requirement that the public interest must dominate any private gain irrespective of the legal status of the condemnor.  We applied this requirement in each of the following cases even though the legal status of the condemnor varied:  Ottofaro -- condemnor was a city; Town of Rocky Mount -- condemnor was a town; Rudee Inlet Auth. -- condemnor was an authority that was a political subdivision of the Commonwealth; Nichols -- condemnor was a public service corporation that manufactured electricity; Carneal -- condemnor was a city; Norfolk County Water Co. -- condemnor was a water company chartered by the Circuit Court of Norfolk County in 1899; Jeter -- condemnor was a water company incorporated by an act of

the General Assembly; Phillips -- condemnors were private individuals and a private corporate entity.

In making its determination whether the public interest dominates the private gain, this Court must consider surrounding circumstances.  Any inquiry that ignores the circumstances surrounding the condemnation when determining whether the public interest dominates the private gain renders meaningful judicial review impossible.  We stated in Carneal:

> "What is a 'public use' is not a matter of discretion with the courts, but is one of sound judgment, under all the facts and circumstances of the particular case. Different courts sometimes arrive at different conclusions upon the same state of facts, but whenever the remedy is applied, it should always be because there is a direct 'public use' of the property taken, and not a mere incidental or indirect public benefit."

Carneal, 129 Va. at 398, 106 S.E. at 407.

In Phillips, supra, this Court considered surrounding circumstances when conducting judicial review of the issue whether private land was taken for a public use.  In Phillips, this Court decided whether former Code § 21-428 was unconstitutional as applied to the facts of that case.  The statute that authorized the taking of private property for public use stated:

> "Any person desiring to drain his lands through the lands of others may apply to the circuit court of the county or corporation court of the city in which the whole or a part of the last mentioned lands lie, for the appointment of commissioners to ascertain and report upon the property [sic] of granting such

31

application, the damages that may be sustained by the party or parties through whose lands the drain is proposed to be run.  Notice of such application shall be given to the proprietors of the lands through which drain is to be run in a manner prescribed by [§§ 25-46.9-.13]."

In Phillips, the condemnors filed a condemnation petition against the landowners seeking to condemn a drainage easement about 12 feet wide and 200 feet long across the landowners' property in Washington County.  The landowners' land was adjoined on the south by a State route and on the north by a creek.  The condemnors owned a tract of 49 acres of land adjacent to the State route, directly across from the landowners' property.  The condemnors intended to develop their 49-acre tract of land into a private housing subdivision.  A Washington County subdivision ordinance required that the plan of subdivision be submitted for approval to several governmental agencies, including the Virginia Department of Highways, which refused to approve the plan because the plan did not provide for adequate surface water drainage.

After an unsuccessful effort to purchase the drainage easement from the landowners, the developers filed a condemnation petition.  The landowners challenged the validity of the statute on the basis that it was unconstitutional on its face and that it was unconstitutional as applied.  The trial court rejected the landowners' challenge and ultimately approved

32

the condemnation and awarded the drainage easement to the condemnors and damages to the property owners.

In Phillips, we applied the very same test that has been applied in this Commonwealth for over 100 years:

> "The salient consideration is not whether a public benefit results, but whether a public use is predominant. 'Public use and public benefit are not synonymous terms.' Richmond v. Carneal, 129 Va. 388, 393, 106 S.E. 403, 405 (1921). It is of no importance '. . . that the public would receive incidental benefits, such as usually spring from the improvement of lands or the establishment of prosperous private enterprises: the public use implies a possession, occupation, and enjoyment of the land by the public at large, or by public agencies; and a due protection to the rights of private property will preclude the government from seizing it in the hands of the owner, and turning it over to another on vague grounds of public benefit to spring from the more profitable use to which the latter may devote it.' "

215 Va. at 547, 211 S.E.2d at 96.

In determining whether there was a public benefit in Phillips, this Court specifically considered surrounding circumstances, and this Court did not limit its inquiry to the property that was the subject of the drainage easement. This Court considered the circumstances surrounding the developers' 49-acre tract, the fact that the drainage easement would ultimately become public property, and many other factors. This Court stated in Phillips:

> "In this case, the attempt to develop the [condemnors'] 49-acre tract for private gain is the genesis and the basis for this condemnation of the easement across land of the [condemnees]. Without the

33

urge to develop the land, the pertinent provisions of the subdivision ordinance are not activated. Without the attempt to develop, Highway Department approval of the plans for drainage is unnecessary. Without the development, the statute transferring title to the easement does not become operative. While the public may be incidentally affected as the result of the ordinance, as the result of the Highway Department regulations, and as the result of the statutory provisions, nevertheless, this incidental public benefit is ancillary to and collateral to the underlying and primary purpose of the taking. That purpose in this case is for the improvement of one's land at his neighbor's expense, and for the establishment of a prosperous private enterprise by the former to the detriment of the latter. Such a taking is not for a public use within constitutional limitations, and amounts to an unconstitutional application of the statute in question in this case.

Id. at 547, 211 S.E.2d at 96.

Clearly, this Court in Phillips did not limit its inquiry solely to the property subject to the condemnation. Had this Court done so, the Court's above-referenced discussion would have been limited to the drainage easement. Thus, the majority's statement – "that the focus of a public use inquiry must be on the property to be acquired by condemnation, not on its effect on neighboring properties" – is inconsistent with our decision in Phillips.

I observe that the majority states in its opinion that "[o]ur holding in Dervishian emphasizes the principle that the focus of a public use inquiry must be on the property to be acquired by condemnation, not on its effect on neighboring properties." I respectfully disagree with the majority's

34

interpretation of our decision in City of Richmond v.

Dervishian, 190 Va. 398; 57 S.E.2d 120 (1950).  In that case,

the City of Richmond passed a resolution authorizing the city

attorney to institute condemnation proceedings to acquire

property that would be used for a parking lot or storage garage

for vehicles.  Id. at 403, 57 S.E.2d at 122.  This Court held

that if "a municipality may, for the purpose of providing

parking space for vehicles, take land adjacent to an existing

street, we know of no reason why it should not provide such

parking space away from the street.  The purpose is the same and

is a public one in either instance."  Id. at 406, 57 S.E.2d at

123-24.

> The landowners in Dervishian argued before this Court
>
> "in their brief that the acquisition of the property
> here in question for a parking lot will primarily
> benefit two near-by department stores and will,
> therefore, not be for a public use.  This contention
> is beside the point.  The fact that property acquired
> to serve the public may also incidentally benefit some
> private individuals does not destroy the public
> character of the use."

Id. at 407, 57 S.E.2d at 124.  This Court did not hold in

Dervishian that a court, when undertaking judicial review of

whether a public purpose existed, is required to focus its

inquiry solely upon the property that is the subject of the

take.

35

The majority's holding in today's decision renders meaningless the concept of judicial review of the issue of public use. If I understand the majority's test correctly, a city in Virginia could decide to generate substantial tax revenue by enticing a developer to construct a football stadium that would be the home of a professional football team. The developer might acquire the parcels upon which the stadium would be constructed, but fail to obtain the necessary drainage easements from residential property owners who live in the neighborhood adjacent to the site of the proposed stadium. The majority's holding would permit the City, which has a properly functioning sewer system, to condemn residential property to construct culverts throughout the residential neighborhood to suit the developers of the football stadium. Upon judicial review, this Court could not consider the football stadium, but would be compelled to focus its inquiry upon whether the condemned land was used for a sewer. Certainly, this narrow view, which the majority today has established as the controlling test, is inconsistent with meaningful judicial review of condemnation proceedings in Virginia.

The following example is also illustrative of the restrictive effect of the majority's test. Assume that the board of supervisors of a large Virginia county adopted a development plan for the county that includes a large mix of

36

retail, commercial, and open space in an area that is currently zoned agricultural. The residents of the agricultural area are farmers whose ancestors have been farmers in that county for many generations. The farmers wish to continue their livelihoods. The county, over the objection of the farmers, decides to condemn the landowners' farms and install underground culverts as a part of the county's sewer system, even though the county has perfectly functioning culverts that serve the agricultural district. Simultaneously, the county negotiated with a developer who agreed to purchase the farmers' property from the county and develop the property in a manner consistent with the county's development plan. The majority's test would preclude this Court from considering an impending transfer of the property to a private party during judicial review of the question whether the county's decision to condemn the farmers' property was for a public purpose. I think, as these scenarios reveal, that the restrictive nature of the majority's test renders judicial review meaningless.

IV.

I am compelled to conclude that upon application of the correct test, which includes consideration of surrounding facts and circumstances, in the case before this Court the public interest does not dominate the private gain and, hence, the taking of Hoffman's private property was illegal. The City

37

admitted, through its officials, that the City did not need a new culvert and that the existing culvert was functioning properly. The City admitted that the new culvert would have less sewer capacity than the current culvert because of the design of the new culvert. The City admitted that the culvert would not need to be relocated but for the City's desire to enable the private developer to construct a high-rise building on the site of the current culvert. The City Engineer admitted that the "real reason" the City desired to relocate the culvert was to enable a private developer to construct a building on the site of the existing culvert. Even though the developer in this case could construct a structure on the current site, the structure would be significantly smaller than its desired structure and would result in a $2,000,000 diminution in the value of the proposed project. The City admitted that it could construct its grid pattern of streets without the necessity of relocating the culvert.

### V.

For the aforementioned reasons, I would reverse the judgment of the circuit court, and I would enter a judgment in favor of Hoffman.